WILBORN ET AL., APPELLANTS, v. BANK ONE CORPORATION ET AL., APPELLEES.

[Cite as *Wilborn v. Bank One Corp.,* 121
Ohio St.3d 546, 2009-Ohio-306.]

(No. 2007–0558—Submitted March 11, 2008—Decided February 3, 2009.)

Cupp, J.

{¶ 1} In this case we decide whether a provision in a residential-mortgage contract requiring a borrower to pay the lender's attorney fees as a condition of reinstatement of the borrower's defaulted mortgage after the lender initiates foreclosure proceedings violates Ohio's public policy. Because we conclude that such a provision does not violate public policy, we affirm the court of appeals' judgment.

I

{¶ 2} The 11 plaintiff-appellants ("borrowers") in this matter filed a class-action complaint in August 2003 against various financial institutions ("lenders"), defendant-appellees herein. One of the plaintiffs, Sharon Wilborn, entered into a home-equity loan agreement with her lender. The agreement was secured by her primary residence. Upon Wilborn's default of the home-equity loan agreement, her lender instituted foreclosure proceedings. The agreement did not include a reinstatement provision, but it did allow Wilborn to make additional payments on her balance at any time. Upon Wilborn's request, she was given a

payoff statement from which she completely paid all amounts owed on her loan. The payoff balance paid by Wilborn included attorney fees incurred by the lender because of the pending lender-initiated foreclosure proceedings. Once Wilborn satisfied the payoff balance and resolved her default, the lender discontinued its foreclosure action against her. The attorney fees were included in the lender's loan-payoff statement pursuant to a term in the home-equity agreement providing that "Mortgagor shall be liable to Mortgagee for all legal costs, including but not limited to reasonable attorney fees and costs and charges of any sale in any action to enforce any of its rights hereunder whether or not such action proceeds to judgment."

{¶ 3} The remaining plaintiff-appellants are borrowers who each entered into residential-mortgage contracts with their respective lenders. It is undisputed that each borrower defaulted on the mortgage and the respective lenders instituted foreclosure proceedings. It is also undisputed that each borrower's mortgage contract contains a reinstatement provision, which permits a borrower, after default but prior to a judgment enforcing the mortgage and note, to bring the payments current, to have the foreclosure litigation discontinued, and to have the mortgage reinstated provided that the lender recovers all its costs, including reasonable attorney fees, incurred in the foreclosure litigation.[1]

{¶ 4} After the lenders instituted foreclosure proceedings but before foreclosure judgments were entered, the borrowers, through mortgage reinstatement or some other workout provision such as modification of the mortgage, each paid their respective lender the amount for which they were in default, as well as costs and attorney fees. Thereafter, the borrowers filed suit against the lenders alleging that the payment of the lenders' attorney fees in connection with

---

1. {¶ a}The reinstatement clause in the borrowers' mortgage contracts were substantially similar. The following clause is representative:

{¶ b}"Borrower's Right to Reinstate. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Paragraph 17 [because of a transfer of the property or the beneficial interest of Borrower]."

surrendered foreclosure proceedings and the loan reinstatement is contrary to Ohio's public policy and therefore void.

{¶ 5} In response to the borrowers' allegations, the lenders filed motions to dismiss for failure to state a claim upon which relief could be granted. The trial court granted the lenders' motions. The Seventh District Court of Appeals affirmed. *Wilborn v. Bank One Corp.*, 7th Dist. No. 04–MA–182, 2007-Ohio-596, 2007 WL 446049. In doing so, the appellate court adopted the rationale set forth in *Washington Mut. Bank v. Mahaffey*, 154 Ohio App.3d 44, 2003-Ohio-4422, 796 N.E.2d 39, that because a borrower in default is not entitled by law to reinstatement, when a borrower chooses to seek reinstatement under the mortgage documents, "the payment of attorney fees is merely a condition for reinstatement, not an obligation that arises in connection with the enforcement of the contract" of indebtedness. *Mahaffey* at ¶ 40. As a result, the appellate court upheld the validity of the attorney-fee provision in connection with loan reinstatement. *Wilborn* at ¶ 32.

{¶ 6} The borrowers again appealed, and we accepted the case under our discretionary jurisdiction on the following proposition of law: "A provision in a residential mortgage to the effect that a borrower in default whose mortgage has been made the subject of a foreclosure action may only reinstate the mortgage, and thereby avoid foreclosure, upon payment of the attorney fees incurred by the lender in initiating the foreclosure action, is against public policy and void. *Miller v. Kyle* (1911), 85 Ohio St. 186 [97 N.E. 372], construed and applied and R.C. 1301.21, construed and applied." *Wilborn v. Bank One Corp.*, 114 Ohio St.3d 1478, 2007-Ohio-3699, 870 N.E.2d 730.

## II

{¶ 7} Ohio has long adhered to the "American rule" with respect to recovery of attorney fees: a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation. *Nottingdale Homeowners' Assn., Inc. v. Darby* (1987), 33 Ohio St.3d 32, 33–34, 514 N.E.2d 702; *State ex rel. Beebe v. Cowley* (1927), 116 Ohio St. 377, 382, 156 N.E. 214. However, there are exceptions to this rule. Attorney fees may be awarded when a statute or an enforceable contract specifically provides for the losing party to pay the prevailing party's attorney fees, *Nottingdale*, 33 Ohio St.3d at 34, 514 N.E.2d 702, or when the prevailing party demonstrates bad faith on the part of the unsuccessful litigant, *Pegan v. Crawmer* (1997), 79 Ohio St.3d 155, 156, 679 N.E.2d 1129.

{¶ 8} When the right to recover attorney fees arises from a stipulation in a contract, the rationale permitting recovery is the "fundamental right to contract freely with the expectation that the terms of the contract will be enforced." *Nottingdale* at 36, 514 N.E.2d 702. The presence of equal bargaining power and the lack of indicia of compulsion or duress are characteristics of agreements that

are entered into freely. See id. at 35, 514 N.E.2d 702. In these instances, agreements to pay another's attorney fees are generally "enforceable and not void as against public policy so long as the fees awarded are fair, just and reasonable as determined by the trial court upon full consideration of all of the circumstances of the case." Id. at syllabus. See also *Worth v. Aetna Cas. & Sur. Co.* (1987), 32 Ohio St.3d 238, 241–243, 513 N.E.2d 253 (an indemnity agreement requiring the payment of qualified legal expenses arising from free and understanding negotiation is enforceable and not contrary to Ohio's public policy).

{¶ 9} In contrast, agreements to pay attorney fees in a "contract of adhesion, where the party with little or no bargaining power has no realistic choice as to terms," are not enforceable. *Nottingdale,* 33 Ohio St.3d at 37, 514 N.E.2d 702, fn. 7. To hold such provisions enforceable would be contrary to the principle that "freedom in bargaining and equality of bargaining * * * are the theoretical parents of the American law of contracts." *Neal v. State Farm Ins. Cos.* (1961), 188 Cal.App.2d 690, 694, 10 Cal.Rptr. 781.

{¶ 10} Similarly, contracts for the payment of attorney fees upon the default of a debt obligation are void and unenforceable. In the context of foreclosure actions, we stated in *Leavans v. Ohio Natl. Bank* (1893), 50 Ohio St. 591, 34 N.E. 1089, syllabus:

{¶ 11} "A stipulation in a mortgage to the effect that, in case an action should be brought to foreclose it, a reasonable attorney fee, to be fixed by the court, for the services of the plaintiff's attorney in the foreclosure action, should be included in the decree, and paid out of the proceeds arising from the sale of mortgaged property, is against public policy and void."

{¶ 12} The rule in *Leavans* was affirmed several years later in *Miller v. Kyle* (1911), 85 Ohio St. 186, 97 N.E. 372, syllabus, which held:

{¶ 13} "It is the settled law of this state that stipulations incorporated in promissory notes for the payment of attorney fees, if the principal and interest be not paid at maturity, are contrary to public policy and void."

{¶ 14} In other words, a provision in a mortgage or promissory note that awards attorney fees upon the enforcement of the lender's rights when the borrower defaults, such as a foreclosure action that has proceeded to judgment, is unenforceable. The rationale for this rule as articulated in *Leavans,* and reaffirmed in *Miller,* is that "the stipulation to pay attorney fees operates as a penalty to the defaulting party and encourages litigation to establish either a breach of the agreement or a default on the obligation." *Worth,* 32 Ohio St.3d at 242, 513 N.E.2d 253.

{¶ 15} The syllabus law of *Leavans* and *Miller* has not been repudiated by this court despite the recognition of numerous situations in which contractual stipula-

tions for attorney fees may be enforced.[2] *Worth*, 32 Ohio St.3d at 243, 513 N.E.2d 253 ("our decision today leaves undisturbed our holding in [*Miller*] and like cases"). See also *New Market Acquisitions, Ltd. v. Powerhouse Gym* (S.D.Ohio 2001), 154 F.Supp.2d 1213, 1226 ("it is true that the Ohio Supreme Court has never explicitly overruled *Miller*").

## III

{¶ 16} The proposition of law presented by the borrowers, to the extent it is modeled after the syllabus of the *Leavans* and *Miller* cases, is an accurate statement of the law regarding the enforceability of attorney-fee provisions in connection with the enforcement of a debt obligation, including a foreclosure proceeding. With the exception of the circumstance presented by appellant Wilborn, however, that statement is incompatible with the facts of this case.

{¶ 17} Foreclosure is a legal process guided by common law and statute. See, e.g., R.C. Chapter 2329 (execution against property); *Carr v. Home Owners Loan Corp.* (1947), 148 Ohio St. 533, 36 O.O. 177, 76 N.E.2d 389. As a result, foreclosure affords a number of mechanisms and processes intended as legal protection for the debtor. See, e.g., R.C. 2329.02 (public foreclosure proceedings); R.C. 2329.09 (writs of execution); R.C. 2329.17 (appraisal of property). One such legal protection is the right of redemption, an absolute right that allows the defaulting borrower to redeem the property even after its public sale (but before confirmation) and to thereby terminate the lender's foreclosure proceedings. Kuehnle & Levey, Baldwin's Ohio Real Estate Law (2008), Section 33:4; R.C. 2329.33; *Hausman v. Dayton* (1995), 73 Ohio St.3d 671, 676, 653 N.E.2d 1190. The statutory and common-law nature of foreclosure proceedings and of the right of redemption results in a system of "checks and balances" for the borrower and lender. The foreclosure proceeding is the enforcement of a debt obligation, and in that situation, the rule against paying another party's attorney fees as articulated in the *Leavans* and *Miller* cases well applies.

{¶ 18} Reinstatement, however, differs from redemption. A defaulting borrower is not entitled by law to have a mortgage loan reinstated. Upon a borrower's default, a lender is entitled to initiate foreclosure proceedings, to be paid in full,

---

2. Contractual attorney-fee provisions have been determined to be enforceable in a number of situations. See *Nottingdale Homeowners' Assn., Inc. v. Darby* (1987), 33 Ohio St.3d 32, 514 N.E.2d 702, syllabus (upholding an attorney-fee provision in a condominium-foreclosure case); *First Capital Corp. v. G & J Indus., Inc.* (1999), 131 Ohio App.3d 106, 721 N.E.2d 1084 (upholding an attorney-fee provision in an accounts-receivable finance agreement if the parties have equal bargaining power, similar sophistication, and an opportunity to obtain counsel); *Goldfarb v. Robb Report, Inc.* (1995), 101 Ohio App.3d 134, 147, 655 N.E.2d 211 (upholding an attorney-fee provision in a franchise agreement); *Gaul v. Olympia Fitness Ctr., Inc.* (1993), 88 Ohio App.3d 310, 623 N.E.2d 1281 (upholding an attorney-fee provision in a loan-guarantee agreement).

and to sever its relationship with the defaulting borrower. A defaulting borrower's right to reinstate the mortgage loan arises solely from the terms of the residential-mortgage contract between the parties. Reinstatement occurs only when the defaulting borrower chooses reinstatement and, consequently, chooses in the existing foreclosure proceeding to forgo those statutory protections arising from the foreclosure process. The defaulting borrower's agreement to pay the lender's attorney fees incurred in connection with the foreclosure proceedings is a reasonable exchange for the right to require the lender to reinstate the defaulted mortgage loan and to forbear the lender's legal rights to foreclose, be presently paid in full, and sever the relationship with the defaulting borrower.

{¶ 19} Thus, a mortgage-reinstatement provision in a residential-mortgage contract creates no obligation on a defaulting borrower to pay a lender's attorney fees until the borrower exercises his or her choice to reinstate. Thus, the borrower's obligation to pay such fees does not arise solely as a consequence of the lender-initiated foreclosure action. Instead, the obligation arises only upon the defaulting borrower's voluntary exercise of the contractual right to reinstate the mortgage loan, a right gained in exchange for the lender's surrender of the present right to foreclosure.[3] Thus, reinstatement is not the enforcement of a debt obligation, and the public-policy concerns expressed in *Miller* and *Leavans* regarding the imposition of a penalty against a debtor upon default have no relevance.

## IV

{¶ 20} Another argument advanced by the borrowers is that the inclusion of the mortgage reinstatement or other workout provision in the mortgages presented to the borrowers by the lenders was not the product of free and understanding negotiation between parties with equal bargaining power. Therefore, the borrowers assert, the attorney-fees provision in the mortgages is a contract of adhesion and unenforceable. Plainly stated, the argument asserts that the documents involved are standard, uniform mortgage forms, and presumably little, if any, negotiation occurred between the borrowers and the lenders as to many of the terms contained in those forms. To this extent, the mortgages may well resemble adhesion contracts.[4]

---

3. We note that any attorney fees awarded must be "fair, just and reasonable as determined by the trial court upon full consideration of all of the circumstances of the case." *Nottingdale,* 33 Ohio St.3d 32, 514 N.E.2d 702, at syllabus.

4. {¶ a}Indeed, it appears that the terms contained in the uniform mortgage forms are not open to negotiation. As advised in 1 Sherman, Ohio Residential Real Estate (2008) 3–7, Section 3.06:

{¶ 21} Nevertheless, the terms contained in the uniform mortgage forms themselves, including the mortgage-reinstatement and other workout provisions, are in reality the result of free and understanding negotiation between parties with equal bargaining power. The following discussion will show that although none of the borrowers or lenders in this case were involved, those who did participate in the process that created the uniform mortgage forms were virtual proxies for the consumers and lenders who would eventually use the product. That process brought together many sophisticated parties with competing interests and significant bargaining power. The reinstatement provision, including the payment of attorney fees incurred by the lender as a condition of reinstatement, was thus agreed to in a representative process of free and understanding negotiation between parties with equal bargaining power.

### A

{¶ 22} The uniform mortgage forms were promulgated by the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The forms were an attempt to achieve the objectives of Fannie Mae and Freddie Mac: to establish a secondary market for residential mortgages. See, generally, former Section 1451, Title 12, U.S.Code, Pub.L. No. 101–73, 103 Stat. 183, 429 (Congressional statement of purpose); Section 1716, Title 12, U.S.Code (same, for Fannie Mae).

{¶ 23} Prior to September 7, 2008, Fannie Mae was a privately owned and managed corporation, created by Congress and subject to broad regulatory control by the secretary of Housing and Urban Development.[5] See Sections 1716b and 1717(a)(1). As set forth in the enabling legislation, Fannie Mae is "authorized pursuant to commitments or otherwise, to purchase, service, sell, or otherwise deal in any mortgages" that are (1) insured or guaranteed by certain federal government agencies or (2) not insured or guaranteed by certain federal government agencies (i.e., conventional mortgages) generally originated by banking institutions and mortgage brokers. Section 1717(b)(1) and (2), Title 12, U.S.Code. The statutory purpose of Fannie Mae is fivefold:

{¶ 24} "(1) [To] provide stability in the secondary market for residential mortgages;

---

{¶ b}"Do not attempt to negotiate any of the terms of a form note and mortgage, except possibly the escrow of taxes and insurance. If the form note and mortgage are altered in any way, the secondary market will not purchase the loan. For that reason, there is no room for negotiation."

5. On September 7, 2008, the director of the Federal Housing Finance Agency ("FHFA") announced a federal takeover of Fannie Mae and Freddie Mac. Both Fannie Mae and Freddie Mac were placed into conservatorship run by the FHFA to ensure their financial soundness. See statement of James B. Lockhart, September 7, 2008, found at *http://www.treas.gov/press/releases/reports/fhfa_statement_090708hp1128.pdf* (last accessed on January 26, 2009).

{¶ 25} "(2) [To] respond appropriately to the private capital market;

{¶ 26} "(3) [To] provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing;

{¶ 27} "(4) [To] promote access to mortgage credit throughout the Nation (including central cities, rural areas, and underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and

{¶ 28} "(5) [To] manage and liquidate federally owned mortgage portfolios in an orderly manner, with a minimum of adverse effect upon the residential mortgage market and minimum loss to the Federal Government." Section 1716, Title 12, U.S.Code.

{¶ 29} Prior to September 7, 2008, Freddie Mac, like Fannie Mae, was a privately owned and managed corporation, created by Congress to act in the residential-mortgage secondary market, subject to the broad regulatory control of the secretary of Housing and Urban Development.[6] Sections 1452(a), (b) and (c) and 1455(j), Title 12, U.S.Code. Similar to Fannie Mae, Freddie Mac is "authorized to purchase, and make commitments to purchase, residential mortgages. [Freddie Mac] may hold and deal with, and sell or otherwise dispose of, * * * any such mortgage or interest therein." Section 1454(a)(1), Title 12, U.S.Code. Freddie Mac transacts in conventional mortgages, i.e., mortgages that are not guaranteed or insured by the government and that are originated, generally, by federal savings and loan associations and other institutions whose deposits are federally insured. Section 1451(i), Title 12, U.S.Code. The statutory purpose of Freddie Mac is threefold and corresponds to the first three of the five Fannie Mae purposes. Former Section 1451, Title 12, U.S.Code, Pub.L. No. 101–73, 103 Stat. 183, 429 (Congressional statement of purpose). See also Section 4501(7), Title 12, U.S.Code ("[Fannie Mae and Freddie Mac] have an affirmative obligation to facilitate the financing of affordable housing for low- and moderate-income families in a manner consistent with their overall public purposes, while maintaining a strong financial condition and a reasonable economic return").

{¶ 30} Immediately after the 1970 amendments to Fannie Mae and the creation of Freddie Mac, it became apparent that the lack of standardization in mortgage documents would hinder the development of a secondary market for conventional

---

6. See supra, note 5.

mortgages.[7] Leibold, Uniform Conventional Mortgage Documents: FHLMC Style (1972), 7 Real Prop.Prob. & Tr.J. 435, 437; Murray, The Developing National Mortgage Market: Some Reflections and Projections (1972), 7 Real Prop.Prob. & Tr.J. 441, 446. Thus, upon the creation of Freddie Mac, the first order of business for the two corporate entities was to lead a concerted effort to create a uniform mortgage form to be used nationwide. Carrozzo, Marketing the American Mortgage: The Emergency Home Finance Act of 1970, Standardization and the Secondary Market Revolution (2005), 39 Real Prop.Prob. & Tr.J. 765, 797. The result was the establishment of a set of forms developed through compromise: while the initial drafts "were quite pro-lender, the final versions gave both lenders and consumers a good deal to show for their efforts." 2 Nelson & Whitman, Real Estate Finance Law (3d Ed.1993) 316, Section 14.1.

B

{¶ 31} The process used to create the uniform mortgage forms was extensive. Representatives of Fannie Mae and Freddie Mac circulated several draft documents to approximately 10,000 lenders and other experts in the mortgage-finance field. Leibold, Uniform Conventional Mortgage Documents, 7 Real Prop.Prob. & Tr.J. at 437; Jensen, Mortgage Standardization: History of Interaction of Economics, Consumerism and Governmental Pressure (1972), 7 Real Prop.Prob. & Tr.J. 397, 401. Because lenders, consumer advocates, and members of Congress voiced extreme dissatisfaction with the draft documents, Fannie Mae and Freddie Mac representatives coordinated two days of public meetings in 1971.[8] Leibold, Uniform Conventional Mortgage Documents, 7 Real Prop.Prob. & Tr.J. at 438; Jensen, Mortgage Standardization, 7 Real Prop.Prob. & Tr.J. at 402. Prior to the public meetings, the proposed forms were published in the Federal Register. 36 Fed.Reg. 48 (4712–4715) (Mar. 11, 1971). Forty witnesses testified, representing the lending industry and consumer groups, including the American Bar Association, Ralph Nader's Public Interest Research Group, and law professors. Jensen, Mortgage Standardization, 7 Real Prop.Prob. & Tr.J. at

---

7. House and Senate Banking and Currency Committee Reports on the act establishing Fannie Mae's authority also directed Fannie Mae to develop standard forms. Murray, The Developing National Mortgage Market (1972), 7 Real Prop.Prob. & Tr.J. 441, 446.

8. Because Fannie Mae and Freddie Mac are private corporations, it was deemed improper to hold formal "public hearings," publish any testimony in the Federal Register, or otherwise invoke the provisions of the Administrative Procedure Act as argued by consumer advocates. Jensen, Mortgage Standardization, 7 Real Prop.Prob. & Tr.J. at 402. Nevertheless, public pressure was sufficient to force the public "meetings" chaired by former Congressman Albert Rains of Alabama, and with the consent of the Senate, publish the testimony from the meetings as a permanent reference work. Id. at 402, fn. 11 (referring to the Senate Committee on Banking, Housing and Urban Affairs, Federal National Mortgage Association Public Meeting on Conventional Mortgage Forms, S.Doc. No. 92–21, 92d Cong., 1st Sess. (1971)).

402; 2 Nelson & Whitman, Real Estate Finance Law at 315, Section 14.1. Others submitted prepared statements. Jensen at 402. After the public meetings, draft forms were revised and circulated to various groups for additional comment. Leibold, Uniform Conventional Mortgage Documents, 7 Real Prop. Prob. & Tr.J. at 438.

{¶ 32} As a result of the testimony of the consumer advocates at the public meeting, the revised final uniform mortgage forms contained extensive consumer protections. See Jensen, Mortgage Standardization, 7 Real Prop.Prob. & Tr.J. at 410–415 (listing consumer-oriented provisions added to the final draft as a result of pressure from consumer advocates). One such compromise provision pertained to a borrower's right to reinstate in the event of a mortgage default. It has been paraphrased as follows:

{¶ 33} "[A]ny proceedings begun by a lender to enforce the mortgage must be discontinued prior to entry of a judgment if (a) the borrower pays all sums which would be due as if no acceleration had occurred, (b) the borrower cures all breaches of any other covenants, (c) the borrower pays all reasonable expenses incurred by lender and (d) the borrower takes such action as lender may reasonably require to assure that the lien of the mortgage and the borrower's obligation to pay will continue unimpaired." Jensen, 7 Real Prop.Prob. & Tr.J. at 415.

{¶ 34} In the end, although a mortgage form uniform to both Fannie Mae and Freddie Mac was not created, each produced its own standard form that was adopted by its board.[9] Id.; Carrozzo, 39 Real Prop.Prob. & Tr.J. at 799. The degree of acceptance of these uniform mortgage forms has been noteworthy: "The resulting forms have been modified in several respects since their promulgation, but most of the original language remains intact, and they are very widely employed, even by lenders who have no expectation of selling their loans to [Fannie Mae or Freddie Mac]." 2 Nelson & Whitman, Real Estate Finance Law at 316, Section 14.1. See also Restatement of the Law 3d, Property (Mortgages) (1997) 569, Section 8.1 (Reporter's Notes) (stating that the Fannie Mae and Freddie Mac uniform mortgage forms are the most commonly used mortgage documents in the United States).

---

9. {¶ a}Specifically, the Fannie Mae and Freddie Mac representatives were unable to agree on prepayment privileges and due-on-sale provisions. Jensen, Mortgage Standardization, 7 Real Prop.Prob. & Tr.J. at 415–417; Carrozzo, Marketing the American Mortgage, 39 Real Prop.Prob. & Tr.J. at 799.

{¶ b}By contrast, Federal Housing Administration and Veterans Affairs form documents, which were created in the 1930s and 1940s, were not the result of any public process balancing lender and consumer interests. See 2 Nelson & Whitman, Real Estate Finance Law at 316, Section 14.1.

{¶ 35} The "borrower's right to reinstatement" provision, added to the uniform mortgage forms as a result of the public meetings, continues to be used in the Fannie Mae and Freddie Mac uniform mortgage forms and has not been revised in any significant manner. Id. (setting forth the full text of the provisions of "Paragraph 18. Borrower's Right to Reinstate"). As stated in the uniform mortgage forms today, the right to reinstate requires the borrower to pay "all expenses incurred in enforcing the [residential-mortgage contracts], including, but not limited to, reasonable attorneys' fees." Moreover, this is the same terminology used in most of the residential mortgages of the borrowers in this case.

{¶ 36} It is in this light that "the simple grace and familiarity of individual lending in local institutions among neighbors and friends [have] given way to a new [process]. * * * [The public meetings] that took place thirty years ago negotiated the mortgage of today's homebuyer." Carrozzo, Marketing the American Mortgage, 39 Real Prop.Prob. & Tr.J. at 803.

### C

{¶ 37} In all, these uniform mortgage forms are the result of sophisticated parties, all with competing interests and wielding significant bargaining power, freely entering discussions, compromises, and negotiations for the purpose of creating " 'what the law of mortgages will be in 50 States in most of the home buying transactions for the next several decades.' " Id. at 798 (quoting Ralph Nader's testimony at the public meeting). Accordingly, we are persuaded that both the borrowers and the lenders in this case are the beneficiaries of the negotiations that culminated in the inclusion of the mortgage-reinstatement or alternate-workout provision in the uniform mortgage forms.

{¶ 38} Moreover, public policy strongly favors the use of these uniform mortgage forms to further Congress's stated purpose and to permit the trading of Ohio's conventional mortgages on the secondary market. To declare some part of these forms unenforceable would make Ohio less competitive in the secondary mortgage market, thwarting the objectives of the Fannie Mae and Freddie Mac enabling legislation, denying lenders liquidity for their investment portfolios, and decreasing the capital available to borrowers for mortgages. In light of the economic difficulties afflicting the national economy as of late, and particularly in the housing sector, our decision today also serves the public policy of this state by avoiding further destabilization.

### V

{¶ 39} The final argument presented by the borrowers is that the provisions of R.C. 1301.21 are applicable to the mortgage-reinstatement terms and these provisions make the attorney-fees terms unenforceable. R.C. 1301.21 authorizes

enforcement of provisions for reasonable attorney fees in contracts that do not evidence primarily personal, family, or household purpose indebtedness and are in excess of $100,000.[10]

{¶ 40} The borrowers claim that because the mortgages evidence personal, family, or household indebtedness, the General Assembly has by implication legislatively eliminated the ability of one party to contractually agree to pay the attorney fees of another in transactions such as those represented by the mortgages. The borrowers assert that since the statute permits contractual attorney fees in commercial transactions, the General Assembly's silence as to residential mortgages indicates an intentional and purposeful prohibition of recovery of attorney fees in residential-mortgage transactions consistent with the rule in *Miller* and is a limitation of the *Nottingdale* principles.

{¶ 41} This contention, however, overreads the statute. The express terms of R.C. 1301.21 state that it applies only to provisions for attorney fees in commercial contracts. R.C. 1301.21(A)(1). Consequently, we decline to apply R.C. 1301.21 to residential-mortgage contracts by implication or by unnecessary statutory construction.

{¶ 42} Moreover, we have already determined that the reinstatement provision is distinguishable from the enforcement of a debt. Because R.C. 1301.21 applies only to the enforcement of a debt, it has no relevance to reinstatement provisions.

## VI

{¶ 43} Although we have concluded that that reinstatement is substantially distinguishable from the enforcement of a debt obligation, the circumstance presented by appellant Wilborn herein is also distinguishable from the circum-

---

10. {¶ a}R.C. 1301.21 states:

{¶ b}"(A) As used in this section:

{¶ c}"(1) 'Contract of indebtedness' means a note, bond, mortgage, conditional sale contract, retail installment contract, lease, security agreement, or other written evidence of indebtedness, other than indebtedness incurred for purposes that are primarily personal, family, or household.

{¶ d}"(2) 'Commitment to pay attorneys' fees' means an obligation to pay attorneys' fees that arises in connection with the enforcement of a contract of indebtedness.

{¶ e}"(3) 'Maturity of the debt' includes maturity upon default or otherwise.

{¶ f}"(B) If a contract of indebtedness includes a commitment to pay attorneys' fees, and if the contract is enforced through judicial proceedings or otherwise after maturity of the debt, a person that has the right to recover attorneys' fees under the commitment, at the option of that person, may recover attorneys' fees in accordance with the commitment, to the extent that the commitment is enforceable under divisions (C) and (D) of this section.

{¶ g}"(C) A commitment to pay attorneys' fees is enforceable under this section only if the total amount owed on the contract of indebtedness at the time the contract was entered into exceeds one hundred thousand dollars.

{¶ h}"(D) A commitment to pay attorneys' fees is enforceable only to the extent that it obligates payment of a reasonable amount."

stances of the other borrowers. Wilborn's home-equity loan agreement did not have a reinstatement provision, so she could not seek that option for remedying her default. Instead, Wilborn paid off her entire principal and interest in a lump sum prior to judgment to terminate the foreclosure proceedings. Once she paid all of the outstanding principal, interest, and court costs in the foreclosure action, the debt to her lender was satisfied, and the lender was required to dismiss the foreclosure action not because of any reciprocal contractual obligation but because no debt remained to be enforced. Nevertheless, Wilborn's lender required her to pay its attorney fees incurred in connection with the foreclosure action as a condition of dismissal.

{¶ 44} In paying the lender's attorney fees in addition to all outstanding principal, interest, and court costs, Wilborn was not voluntarily exercising a contractual right prior to judgment in exchange for the surrender of some other right by the lender. Once Wilborn paid off the entire debt, she had a right to dismissal, but instead she was required to pay the lender's attorney fees incurred in the enforcement of the note and mortgage debt. Such a circumstance has all the indicia of imposing attorney fees in connection with the enforcement of a debt, in contravention of the rule articulated in *Leavans*, 50 Ohio St. 591, 34 N.E. 1089, and *Miller*, 85 Ohio St. 186, 97 N.E. 372. The fact that the principal and interest owing on the account, together with court costs, had been paid before the lender obtained a judgment does not transform the underlying legal action into anything other than an action to enforce a debt. Thus, the attorney-fee provision contained in Wilborn's loan agreement is unenforceable under Ohio's long-standing rule that attorney fees may not be collected against the debtor in an action to enforce a debt.

## VII

{¶ 45} Based on the foregoing, we hold that a provision in a residential-mortgage contract requiring a defaulting borrower to pay a lender's reasonable attorney fees as a condition of terminating pending lender-initiated foreclosure proceedings on a defaulted loan and reinstating the loan is not contrary to Ohio statutory or decisional law or against Ohio public policy.

{¶ 46} The judgment of the court of appeals is reversed as to appellant Wilborn and is affirmed in all other aspects. The cause is remanded to the trial court for further proceedings not inconsistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

MOYER, C.J., and LUNDBERG STRATTON, O'CONNOR, O'DONNELL, and LANZINGER, JJ., concur.

PFEIFER, J., concurs in judgment only.

---

Volkema Thomas, L.P.A., Michael S. Miller, and Daniel R. Volkema; National Consumer Law Center and Stuart T. Rossman; and Locks Law Firm, P.L.L.C., and Seth R. Lesser, for appellants.

Reed Smith, L.L.P., James C. Martin, Perry A. Napolitano, Joseph E. Culleiton, and David J. Bird; Comstock, Springer & Wilson Co., L.P.A., and Bobbie L. Flynt; Manchester, Bennett, Powers & Ullman and Stephen T. Bolton; and Mayer Brown, L.L.P., Lucia Nale, and Diane Swisher Andsager, for appellees Bank One, N.A. (Ohio), Ameriquest Mortgage Co., Wells Fargo Home Mortgage, Inc., Washtenaw Mortgage Co., Mortgage Electronic Registration Systems, Inc., and Chase Manhattan Mortgage Corp.

Horton & Horton Co., L.P.A., Earle C. Horton, and Brett E. Horton, for Federal Deposit Insurance Corporation, as receiver of appellee Washington Mutual Bank (successor to Homeside Lending, Inc.).

Lerner, Sampson & Rothfuss and Rick D. DeBlasis, for appellee Lerner, Sampson & Rothfuss.

Tucker Ellis & West, L.L.P., Irene C. Keyse–Walker, and Karl A. Bekeny, urging affirmance for amici curiae Federal Home Loan Mortgage Corporation, American Bankers Association, American Financial Services Association, Consumer Bankers Association, Consumer Mortgage Coalition, Mortgage Bankers Association, Ohio Bankers League, and Ohio Mortgage Bankers Association.

Richard Cordray, Attorney General, Benjamin C. Mizer, Solicitor General, and Todd A. Nist, Assistant Solicitor, urging reversal for amicus curiae state of Ohio.

Benson A. Wolman, Rachel K. Robinson, Paul B. Bellamy, and Judith B. Goldstein, urging reversal for amici curiae Equal Justice Foundation, Ohio State Legal Services Association, Southeastern Ohio Legal Services, Northeast Ohio Legal Services, Legal Aid of Western Ohio, Advocates for Basic Legal Equality, Legal Aid Society of Columbus, Legal Aid Society of Cleveland, and Coalition on Homelessness and Housing in Ohio.