[Cite as *Mockensturm v. McIlwain*, 2021-Ohio-532.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Carl B. Mockensturm

    Appellant

v.

 Craig McIlwain

    Appellee

Court of Appeals No. L-20-1035

Trial Court No. 19CVF00203

**<u>DECISION AND JUDGMENT</u>**

Decided: February 26, 2021

* * * * *

Mark M. Mockensturm and Kevin C. Urtz, for appellant.

Alan Kirshner, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} In this case, plaintiff-appellant, Carl B. Mockensturm, appeals the January 9, 2020 judgment of the Maumee Municipal Court that awarded him $58.80 plus interest against the defendant-appellee, Craig McIlwain. For the following reasons, we affirm, in part, and reverse, in part.

{¶ 2} On March 4, 2019, Mockensturm sued McIlwain in the Maumee Municipal Court, alleging that McIlwain owed $4,596.22 on an outstanding promissory note. On March 28, 2019, McIlwain answered the complaint, denying that he owed anything on the note. He also filed a counterclaim against Mockensturm, alleging that he failed to pay $15,000 for custom furniture that McIlwain built for him. The court held a bench trial on January 8, 2020, at which time the following testimony and evidence was heard.

{¶ 3} McIlwain was previously married to Mockensturm's stepdaughter. In 2012, while that marriage was still intact, Mockensturm loaned $20,000 to McIlwain. The loan is memorialized in a promissory note dated December 17, 2012, signed by McIlwain, which states that McIlwain must repay the $20,000 loan, with interest at an annual rate of 0.22 percent. Under the note, the "Due Date" for repayment is "any future date on which the Lender demands repayment," and after the Due Date, interest would accrue at an annual rate of 0.50 percent. The note further provides that "[i]f any payment obligation under this Note is not paid when due, the Borrower shall be obligated to pay all costs of collection, including reasonable attorney fees* * *."

{¶ 4} Mockensturm's daughter and bookkeeper, Michele Topar, managed the loan for her father through her business, Advanced Bookkeeping Concepts. Topar recorded McIlwain's payments on a spreadsheet, and calculated the outstanding principle and interest on a running basis.

2.

**{¶ 5}** McIlwain did not make any payments on the loan until 2014. McIlwain made an initial payment of $5,000 on July 11, 2014, and a second payment of $1,500 on August 11, 2014. Thereafter, the parties amended their agreement.

**{¶ 6}** On August 12, 2014, McIlwain emailed Mockensturm a "memo of understanding" which, he said, memorialized a discussion they had the day before. The memo states:

> I, Craig Mcilwain, owing Carl Mockensturm the remaining sum of $13,500 in principle of a total sum of $20,000, agree to make a monthly payment of $1500.00 due by the 15th of each month. The next payment due September 15, 2014. The final payment will be due March 15, 2015. This will require that in certain months more than the minimum payment will be paid. Likely months being October, November, and February. The February 2015 payment will be made approximately 1 week later than usual based on expected cash flow and show schedule.

Mockensturm acknowledged his agreement at the bottom of this document, where he added:

> Carl B. Mockensturm 8-13-14
>
> I agree to the above and add to this memo a [sic] understanding on a more fair interest rate than what is stated in the original note.
>
> A more fair rate due to the length of the time should be 5% from this date forward until Paid in Full.

3.

{¶ 7} According to Topar's records and testimony, McIlwain issued only four checks to Mockensturm after this amendment: a check for $1,500 on October 20, 2014; a check for $750 on March 4, 2015; a check for $1,500 on April 3, 2015, and a check for $1,500 on May 8, 2015. At trial, McIlwain claimed that he made additional payments by check, but he did not have any records to prove it. He explained that he lost all of his records after his divorce, when his ex-wife took over the house and all its contents. McIlwain also claimed that he made several cash payments that are not reflected on Topar's ledger, but he did not say how much cash he paid or when he paid it. He also did not have any records of these cash payments. McIlwain explained that he did not think to get a receipt for any of his cash payments because "it's family."

{¶ 8} The bulk of the parties' dispute concerns whether McIlwain received appropriate credits to his outstanding debt in exchange for various pieces of furniture that McIlwain handcrafted for Mockensturm's family. Mockensturm testified that he did not owe any compensation for this furniture, claiming that he was not involved in these transactions and that the furniture was "never mine." When McIlwain's attorney questioned Mockensturm regarding his reply to counterclaim—in which he admitted that McIlwain built various pieces of furniture "[a]t plaintiff's request"—Mockensturm responded "I don't know what that's about." Mockensturm explained that Topar ordered furniture from McIlwain directly. Instead of paying McIlwain for the furniture she ordered, Topar made loan payments to Mockensturm on McIlwain's behalf and then recorded these payments on her spreadsheet. Mockensturm did acknowledge, however,

4.

that he agreed to apply a credit to McIlwain's loan as payment for a fireplace mantle that, he said, his son had purchased from McIlwain. Mockensturm testified that he does not recall any conversations with McIlwain regarding *how much* credit should be given to McIlwain in exchange for any of the furniture, and there is very little documentation in that regard.

{¶ 9} Topar confirmed that she bought various pieces of furniture from McIlwain. She claims that she paid McIlwain directly for some of the furniture, while in other instances he told her to make a loan payment to Mockensturm on his behalf. While Topar acknowledged that McIlwain did not provide invoices for most of the furniture she purchased, she did not explain how she determined the value of any items that lacked an invoice. Topar did, however, testify that McIlwain "has had copies of [the spreadsheet] in the past"—i.e., the spreadsheet that tracked McIlwain's payments and documented the various credits that she gave him in exchange for his furniture—but Topar did not say *when* McIlwain received those copies or *what* was reflected on the copies that he received. And there is no documentation in the record to show which versions of the spreadsheet McIlwain received. McIlwain did admit that he had received copies of the ledger in the past, but he "had a hard time figuring them out" because "they always seemed to be different and * * * give something and then take it away * * *. I never knew what was going on with those sheets."

{¶ 10} McIlwain testified that he never agreed to accept the values that Topar assigned to his furniture in her ledger, and he denied that he received any direct payments

from Topar for any furniture. He also testified that he made all of the furniture at Mockensturm's request. He said "I never felt like it was coming from Michele, it always felt like it was coming from Carl, I mean that's the way it always looked. I was pretty much doing the work for Carl." McIlwain testified that he tried to make payments on the loan, but "the financial pressures got harder and harder" for him. And, because McIlwain was not able to make many payments, he "felt like there was a lot of pressure on [him] to do this stuff [i.e., make furniture] because [he] owed the money." He said that he did not send many invoices to the Mockensturms because "it was mostly fairly loose."

{¶ 11} Although he does not have anything in writing, McIlwain thought that the loan "was done" after he finished his last piece of furniture for the Mockensturms in November 2015. He did not hear anything else on the loan until after he and his wife—Mockensturm's stepdaughter—divorced in 2018.

{¶ 12} At trial, McIlwain presented the expert testimony of Scott Midgley, a custom woodworker. Mockensturm objected to Midgley's testimony on the grounds of relevancy, and the trial court overruled the objection. Midgley explained the time, effort, and skill that is required to make custom furniture pieces like the ones that McIlwain crafted for the Mockensturms. He then provided estimated values for each of McIlwain's furniture pieces. Before he did, Mockensturm's counsel confirmed to the trial court that, although he maintained that the value of the furniture was established by the parties' own dealings (and, therefore, Midgley's testimony was irrelevant), he did not have any

6.

objection to the content of Midgley's testimony "as far as his estimates go." In other words, Mockensturm did not object to Midgley's valuations as fair estimates.

{¶ 13} In total, McIlwain built six different collections of furniture for the Mockensturms: (1) a TV cabinet with television mount, (2) an oak shelf, computer cabinet, and desk, (3) a large conference room table, (4) a small conference room table, (5) a chair rail, and (6) a fireplace mantle. The relevant testimony regarding this furniture can be summarized as follows:

{¶ 14} *1. TV cabinet with television mount.* McIlwain installed a custom television platform and wall mount in Mockensturm's house. Topar did not give McIlwain any credit for this piece of furniture on her ledger. According to Mockensturm, this "never had anything to do with * * * the note" and he was "pretty sure" that McIlwain built this piece before the 2012 loan. Mockensturm said it was a "family project" and they both worked on it together. McIlwain, on the other hand, stated that he was "pretty sure" and "almost certain" that he did this work for Mockensturm after the note. He testified that he expected to be compensated for this piece, he was never compensated for it, and it was not a "gift." Midgley testified that a fair price for this piece of furniture, based on the time and work involved, was $1,471.

{¶ 15} *2. Oak shelf, computer cabinet, and desk.* In 2015, McIlwain made a custom oak shelf along with a computer cabinet and desk for Topar's business, ABC. McIlwain issued a handwritten invoice for $935, which he discounted to $750 for both pieces. McIlwain testified that he discounted the price because "Carl was pushing me

7.

pretty hard to do this stuff for her so I made it easy by throwing a little discount in there." Topar made a $750 loan payment to her father, on McIlwain's behalf, as compensation for this furniture. Topar's ledger for McIlwain's outstanding loan includes a credit for $750 on March 4, 2015, with the notation "ABC Paid." McIlwain testified regarding the time and effort that it took to create these items. Midgley said that a fair price for this furniture, based on the time and work involved, was $2,100.

{¶ 16} *3. Large conference room table.* In 2015, McIlwain made a white oak and mahogany conference room table for Topar's office. Topar claims that she paid $1,200—to McIlwain directly—for this table, and that this transaction had nothing to do with the note. Topar did not, however, produce an invoice, canceled check, or any other documentation regarding this purchase, stating that she did not think she needed such documents for court "since it was my own personal side deal." At trial, McIlwain presented a copy of an email that Mockensturm sent to McIlwain on July 22, 2015, regarding this table, which stated:

> Hi Craig. Confirming my order for Michele.
>
> Table to be approx. 8' long by 36" wide. Wood from existing stock.
>
> Call me when you have a plan for the style and color of finish.
>
> Any idea on the timing?

When asked about this email at trial, Mockensturm stated that he "just provided measurements." Topar did not give McIlwain any credit for this table on her ledger, but she did make a note at the bottom of the ledger that states "Conference table in

8.

D-2 – Michele's Conference Table – paid Ck for $1,200 – No bonus since hasn't made payments." She testified that her dad was considering giving him a bonus because the table "looked really nice" but decided against it because "he hadn't made any payments and hadn't tried to." McIlwain testified regarding the time and effort that it took to create the table, and McIlwain claimed that he never received any payment for it. Midgley testified that a fair price for this conference room table, based on the time and work involved, was $4,860.

{¶ 17} *4. Small conference room table.* In 2015, McIlwain made a small conference room table—also referred to by the parties as a "round" or "triangular" conference room table—for Topar's business. Topar testified her conference room tables were ordered by "me and my dad." She said, "I needed a conference room table and we thought hey, let's ask Craig." Topar's internal business records regarding her purchase of this table includes a handwritten note stating "NEVER got invoice from Craig. He wanted me to pay dad as a loan payment on his behalf." On January 23, 2015, Topar transferred $1,800 to her father's trust as payment for the table. Topar's ledger for McIlwain's outstanding loan includes a credit for $1,800 on January 23, 2015, with the notation "ABC Paid." McIlwain testified regarding the time and effort that it took to create the table, and he claimed that he never agreed to accept the amount of credit that is reflected on Topar's register. Midgley testified that a fair price for this conference room table, based on the time and work involved, was $3,980.

9.

{¶ 18} *5. Chair rail.* Topar testified that she paid $604 to McIlwain for a chair rail for her office in a transaction "that had nothing to do with the loan at all." She did not, however, produce any records of payment at trial. Topar's ledger for McIlwain's outstanding loan does not include a credit for the chair rail, and Mockensturm stated that he had "nothing" to do with this purchase. McIlwain testified regarding the time and effort that it took to create the chair rail, and he claimed that he never received any payment for it. Midgley testified that a fair price for the chair rail, based on the time and work involved, was $2,010.

{¶ 19} *6. Mantle.* In 2015, McIlwain created a custom mantle for Mockensturm's son. As Topar testified, McIlwain made a mantle for her brother's fireplace, and "dad paid for that" and "instead of giving Craig a check Craig said just apply it to the loan so, again, that's what we did." Topar's ledger includes a credit dated July 1, 2015, for $600, with the following notation: "Trade work for Mantel at Mike's House." McIlwain testified regarding the time and effort that it took to create the mantle, and he stated that he never agreed to accept the amount of credit that is reflected on the register. Midgley did not estimate a value for the mantle, but McIlwain testified that a fair value would represent 40 hours of work at $45 an hour—i.e., $1,800.

{¶ 20} The final credit on Topar's payment ledger is a "bonus" credit for $600 on November 3, 2015—there is no record of any additional payments on the loan after this date. Topar testified that Mockensturm "decided to try and help Craig out and give him a

bonus for $600 for all of the work that he did just because he was trying to help him out." According to McIlwain, he thought that the loan was "done."

{¶ 21} McIlwain, however, received a letter from Mockensturm's attorneys on January 18, 2019, stating that there was still money owed on his loan and threatening collection proceedings if McIlwain did not pay the full amount outstanding—which, the letter stated, was $4,596.22 as of that date. McIlwain did not pay, and Mockensturm filed this case a few weeks later.

{¶ 22} After considering all of this testimony and evidence, the trial court issued a ruling from the bench. First, the trial court rejected McIlwain's argument that laches precluded Mockensturm from enforcing the note, and found that McIlwain owed a total of $4,628.80 on the note.

{¶ 23} Regarding the furniture purchases and payments, the trial court noted that although there was "little or no testimony on who ordered the pieces, what they were supposed to look like, how fancy they were supposed to be," there were "some things * * * which were able to be garnered by the testimony and the evidence presented." The court noted that "[t]he relationship of the parties" was a factor in the "ordering patterns and * * * what was ordered." It then considered some of the items of furniture. It rejected Midgley's valuation for the printer cabinet, saying "I don't believe that printer cabinet cost $2,100 to fabricate, I just don't believe it." The trial court also noted that there was not enough evidence for him to determine the value of the TV stand. But the court went on to state:

11.

The table on the other hand, the round table I believe every bit that that could have cost $3,980, not the $1,800 that was given credit. I believe the mantel would have cost $1,800 as opposed to the 600. And I believe the, those seem to be, there was evidence on Exhibit M, evidence there's uncontested that the conference table was, appeared to be an agreed price of $1,200, therefore the set off is at $4,570.

{¶ 24} The court then stated that "judgment for the plaintiff" in the amount of $58.80, "judgment for plaintiff on the Counterclaim," and "cost to defendant." Court was then adjourned.

{¶ 25} The next day, January 9, 2020, the trial court issued a written decision and judgment entry. In its two-paragraph written decision, the court noted that a bench trial was held on January 8, 2020 and, "[u]pon consideration of the testimony and evidence presented," the court granted judgment to Mockensturm on his complaint and awarded damages in the amount of $58.80 with interest at the rate of 5 percent per annum from the date of judgment, granted judgment to Mockensturm on the counterclaim, and ordered McIlwain to pay costs. The trial court did not provide any reasoning for its judgment, and neither party requested findings of fact and conclusions of law under Civ.R. 52.

{¶ 26} Mockensturm filed a notice of appeal on February 4, 2020. McIlwain filed a notice of cross-appeal on February 14, 2020, but never filed a brief within the time prescribed by the appellate rules. For the sake of clarifying the record, we hereby dismiss McIlwain's cross-appeal under App.R. 18(C) for failing to file a brief.

12.

{¶ 27} Mockensturm timely filed an appellant's brief, in which he asserts the following assignments of error:

> **No. 1:** The Trial Court's decision to setoff the amount Appellee owed to Appellant under the promissory note was against the manifest weight of the evidence.
>
> **No. 2:** The Trial Court abused its discretion when it failed to award Appellant his reasonable attorney fees as described in the promissory note.

**II. The trial court's decision to setoff the amount that
McIlwain owed to Mockensturm under the promissory note
was not against the manifest weight of the evidence.**

{¶ 28} In his first assignment of error, Mockensturm argues that the trial court's decision to setoff the amount that McIlwain owed to Mockensturm under the note was against the manifest weight of the evidence because (1) McIlwain did not assert setoff as an affirmative defense, (2) there was no mutuality of obligation between Mockensturm and McIlwain, (3) McIlwain was already compensated for the furniture that he built for Topar and Mockensturm's son, and (4) the trial court "arbitrarily" assigned value to the furniture.

{¶ 29} An appellate court reviews judgments from the trial court following a bench trial under the manifest weight of the evidence standard. *Terry v. Kellstone, Inc.*, 6th Dist. Erie No. E-12-061, 2013-Ohio-4419, ¶ 12. The manifest weight standard is the same in a civil case as in a criminal case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17-23. "When weighing the evidence, the court of appeals

13.

must consider whether the evidence in a case is conflicting or where reasonable minds might differ as to the inferences to be drawn from it, consider the weight of the evidence, and consider the credibility of the witnesses to determine if 'the jury clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Quest Workforce Solutions, LLC v. Job1USA, Inc.*, 2016-Ohio-8380, 75 N.E.3d 1020, ¶ 41 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21.

{¶ 30} Here, in the trial court's judgment entry following bench trial, it awarded $58.80 to Mockensturm on his complaint, and found in Mockensturm's favor on McIlwain's counterclaim. The trial court's judgment entry did not include any factual findings, and the trial court was not required to provide any further explanation of its ruling. Under Civ.R. 52, "[w]hen questions of fact are tried by the court without a jury, judgment may be general for the prevailing party" unless one of the parties requests findings of facts and conclusions of law within the time prescribed by the rule. Neither Mockensturm nor McIlwain requested findings of fact and conclusions of law. Where an appellant did not request findings of fact and conclusions of law under Civ.R. 52, it is improper for an appellate court to speculate on the mental process of the trial court. *Howell v. Vance*, 12th District Clermont No. CA85-09-069, 1986 WL 8910, *2 (Aug. 18,

14.

1996) ("[w]hile it would be error of reversible magnitude for a court to simply arbitrarily select a damage figure not sustained by the evidence, we will not presume this is what the trial court did when appellant has not utilized a Civil Rule, Civ.R. 52, which is designed to allow us to make such a determination" because it would be "improper" for the appellate court to "speculate" on the trial court's "mental process" in that situation.).

{¶ 31} Moreover, the court did provide insight into its mental process here. After testimony concluded, it found that the "relationship of the parties" was a factor in their "ordering patterns" for the furniture, and the court accepted certain furniture valuations as fair and accurate. The trial court then stated that McIlwain owed $4,628.80 to Mockensturm on the note, Mockensturm owed $4,570 to McIlwain for the custom furniture, and these mutual debts should be setoff—resulting in an award of $58.80 to Mockensturm.

{¶ 32} A setoff is defined as "that right which exists between two parties, each of whom under an independent contract owes a definite amount to the other, to set off their respective debts by way of a mutual deduction." *Witham v. South Side Bldg. & Loan Ass'n of Lima, Ohio*, 133 Ohio St. 560, 562, 15 N.E.2d 149 (1938); *Tejeda v. Toledo Heart Surgeons, Inc.*, 186 Ohio App.3d 465, 2009-Ohio-3495, 928 N.E.2d 1138, ¶ 53 (6th Dist.). A central element of a right to setoff is the existence of mutuality of obligation. *Witham* at 562. Mutuality is lacking where both parties to the transaction on which suit was brought are not also parties to the independent contract on which a right of setoff is claimed. *Id.*

15.

{¶ 33} As this court has recognized, a right of setoff can be asserted "as an affirmative defense in [the] answer or by way of counterclaim." *Beck v. Mar Distribs. of Toledo, Inc.*, 6th Dist. Lucas No. L-11-1219, 2012-Ohio, 5321, ¶ 16. Although McIlwain did not assert setoff as an affirmative defense, he asserted a counterclaim against Mockensturm in which he alleged that he built various items of furniture "[a]t plaintiff's request" and plaintiff "failed to pay defendant for said labor work and materials" and "failed to credit defendant for [the furniture] on the note." Under Civ.R. 13(C), a counterclaim "may or may not diminish or defeat the recovery sought by the opposing party. It may claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party." In other words, pursuant to Civ.R. 13(C), "a counterclaim is now any claim, *including setoff* or recoupment, which a defendant may have against a plaintiff." (Emphasis added). *Murphy v. Hall*, 11th Dist. Trumbull No. 2019-T-0022, 2020-Ohio-163, ¶ 24, quoting *Indus. Fabricators, Inc. v. Natl. Cash Register Corp.*, 10th Dist. Franklin No. 83AP-13, 1984 WL 4669, *5 (Mar. 8, 1984) (finding that the trial court did not err by construing defendant's affirmative defense for setoff as a counterclaim under Civ.R. 8(C), which allows a court to treat a defense as a counterclaim "if justice so requires."). We therefore reject Mockensturm's argument that McIlwain was not entitled to any setoff because he did not assert a right of setoff as an affirmative defense.

{¶ 34} Turning to the substantive issue of setoff, we reject Mockensturm's arguments that the trial court's judgment is against the manifest weight of the evidence.

16.

{¶ 35} First, regarding mutuality of obligation, although Mockensturm testified that he was not involved in the furniture transactions, there was evidence in the record to the contrary. For example, in Mockensturm's reply to McIlwain's counterclaim, he admitted that McIlwain built various pieces of furniture "[a]t plaintiff's request." McIlwain introduced an email in which Mockensturm stated he was confirming "my order for Michele" for the large conference room table. Topar testified that some of the orders came from "me and my dad." Most importantly, McIlwain testified that he always felt that the furniture orders were "coming from Carl" and that he was "pretty much doing the work for Carl." He further testified that he felt like there was "a lot of pressure" on him to make the furniture because he "owed the money" on the note to Mockensturm.

{¶ 36} Notably, with the exception of Mockensturm's email regarding the large conference room table, there was no documentation to prove who ordered what furniture. Thus, the trial court was left to determine—as a necessary prerequisite to setoff—whether there was mutuality of obligation between Mockensturm and McIlwain by assessing the relative credibility of the witnesses on that issue. Although under a manifest-weight standard we consider credibility of witnesses, we must nonetheless extend special deference to the trial court's credibility determinations given that the trial court had "the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Wright*, 6th Dist. Lucas No. L-16-1053,

17.

2017-Ohio-616, ¶ 47, citing *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. Here, we cannot say that the trial court lost its way simply because it believed McIlwain instead of Mockensturm on that issue.

{¶ 37} For this same reason, we also reject Mockensturm's claim that McIlwain is not entitled to a setoff because he was already compensated for the furniture that he built. There was little documentation and testimony regarding any agreed-upon prices for the furniture. Indeed, while Topar acknowledged that McIlwain did not provide invoices for most of the furniture that was purchased, she did not explain how she assigned values to furniture that lacked an invoice. In addition, McIlwain clearly testified that he did not agree to accept the credits that are reflected on Topar's ledger, and he claimed that he did not receive any payment from anyone for various items of furniture. Again, this issue required the trial court to consider the respective credibility of the witnesses, and we cannot say that the trial court lost its way when it parsed the evidence and determined that Mockensturm owed McIlwain for the custom furniture.

{¶ 38} Finally, we reject Mockensturm's claim that the trial court "arbitrarily" assigned value to the furniture. Both McIlwain and Midgley testified that it was time consuming to build the various pieces of custom furniture, and provided their opinions regarding the fair value of the furniture given the time, effort, and materials involved. Moreover, Mockensturm's counsel explicitly stated that he had no objection to Midgley's estimated values for the furniture. The trial court apparently accepted some of this testimony, and we cannot say that it lost its way in doing so—especially since there was

18.

evidence to support the trial court's valuations, and we must make every reasonable presumption in favor of the trial court's judgment.

{¶ 39} In sum, after reviewing the record, we cannot say that the trial court lost its way and thereby created a manifest miscarriage of justice when it set off the parties' respective debts and awarded judgment to Mockensturm for $58.80. Mockensturm's first assignment of error is found not well-taken.

## II. The trial court erred by failing to award reasonable attorney fees to Mockensturm.

{¶ 40} In his second assignment of error, Mockensturm argues that the trial court abused its discretion when it failed to award Mockensturm reasonable attorney fees under the note, which provides that "[i]f any payment obligation under this Note is not paid when due, the Borrower shall be obligated to pay all costs of collection, including reasonable attorney fees * * *." Although Mockensturm did not bring a separate claim against McIlwain for attorney fees, his prayer for relief requested judgment "in the amount of $4,596.22, plus interest, costs and attorneys' fees." The trial court did not address the issue of attorney fees, thereby overruling the request sub silento. *Jones v. McAlarney Pools, Spas & Billiards, Inc.*, 4th Dist. No. 07CA34, 2008-Ohio-1365, ¶ 10.[1]

---

[1] In cases, such as this, where the plaintiff does not invoke a specific statutory or rule authority as a basis for its request for attorney fees and, instead, simply includes an unspecified request for attorney fees in the prayer for relief, appellate courts do not view the general request for fees as a separate and distinct claim for purposes of Civ.R. 54(B). *Jones* at ¶ 12. *See also PC Surveillance.net, LLC v. Rika Group Corp.*, 7th Dist. Mahoning No. 11 MA 165, 2012-Ohio-4569, ¶ 16-17; *Scott v. Lyons*, 11th Dist.

19.

{¶ 41} To begin, Mockensturm cites an incorrect standard of review. If a contract is clear and unambiguous, then its interpretation is a matter of law because there is no issue of fact to be determined, and the trial court's interpretation is reviewed de novo on appeal. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 652 N.E.2d 684 (1995). "If the terms of the contract are unambiguous, the court must enforce the intent of the parties as expressed by the contract." *Harris v. Reiff*, 6th Dist. Wood No. WD-03-056, 2003-Ohio-7264, ¶ 9. Moreover, although a prevailing party in a civil action may not recover attorney fees as part of the costs of litigation under the "American rule" that has been adopted by Ohio courts, there are certain exceptions to that rule. *Wilborn v. Bank One Cor.*, 121 Ohio St.3d 546, 2009-Ohio-306, 906 N.E.2d 396, ¶ 7. Relevant here, the American rule does not apply where "an enforceable contract specifically provides for the losing party to pay the prevailing party's attorney fees." *Id.*

{¶ 42} Here, the contract unambiguously states, "[i]f any payment obligation under this Note is not paid when due, the Borrower shall be obligated to pay all costs of collection, including reasonable attorney fees * * *." Mockensturm sued McIlwain claiming that he had not paid the balance due on the note, and the trial court concluded that McIlwain did, in fact, have an outstanding payment obligation under the note that was not paid when due. Accordingly, under the note, McIlwain is "obligated to pay all costs of collection, including reasonable attorney fees."

---

Ashtabula No. 2008-A-0032, 2009-Ohio-1141, ¶ 30; *Knight v. Colazzo*, 9th Dist. Summit No. 24110, 2008-Ohio-6613, ¶ 9.

**{¶ 43}** We find Mockensturm's second assignment of error well-taken. Under the unambiguous terms of the note, Mockensturm is entitled to recover reasonable attorney fees. We therefore reverse and remand this matter to the trial court for a determination of Mockensturm's reasonable attorney fees.

### III. Conclusion

**{¶ 44}** We find that the trial court's judgment awarding a total of $58.80 to Mockensturm was not against the manifest weight of the evidence. Accordingly, we find Mockensturm's first assignment of error not well-taken.

**{¶ 45}** We also find that Mockensturm is entitled to recover reasonable attorney fees from McIlwain under the unambiguous language of the promissory note. Accordingly, we find Mockensturm's second assignment of error well-taken. We reverse and remand this matter to the trial court for a determination of Mockensturm's reasonable attorney fees. The trial court's judgment is affirmed in all other respects.

**{¶ 46}** We therefore affirm, in part, and reverse, in part, the January 9, 2020 judgment of the Maumee Municipal Court. The parties are ordered to split the costs of this appeal under App.R. 24(A)(4).

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.          _____
                                              JUDGE

Christine E. Mayle, J.

Gene A. Zmuda, P.J.          _____
CONCUR.                                    JUDGE

                                _____
                                              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.