[Cite as *Becker v. Direct Energy, LP*, 2018-Ohio-4134.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STEPHEN B. BECKER | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27957 |
| | : | |
| v. | : | Trial Court Case No. 2016-CV-4148 |
| | : | |
| DIRECT ENERGY, LP | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 12th day of October, 2018.

. . . . . . . . . . .

JEFFREY M. SILVERSTEIN, Atty. Reg. No. 0016948 and RANDOLPH H. FREKING, Atty. Reg. No. 0009158, 600 Vine Street, 9th Floor, Cincinnati, Ohio 45202
        Attorneys for Plaintiff-Appellee

ANGELIQUE PAUL NEWCOMB, Atty. Reg. No. 0068094 and CHAD J. KALDOR, Atty. Reg. No. 0079957, 21 East State Street, 16th Floor, Columbus, Ohio 43215
        Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} In this case, Defendant-Appellant Direct Energy, L.P. ("DE") appeals from a judgment in favor of Plaintiff-Appellee, Stephen Becker, on claims for breach of an employment agreement and breach of the duty of good faith and fair dealing. After a jury trial, the jury awarded Becker $655,733.44 in damages and rejected Becker's claim for defamation.

{¶ 2} In support of its appeal, DE contends that the trial court erred in overruling its motion for summary judgment and in denying its motion for directed verdict on Becker's claims for breach of contract and breach of the duty of good faith and fair dealing. According to DE, the trial court also erred in instructing the jury on the breach of contract claim. Finally, DE contends that the trial court abused its discretion in finding that DE acted in bad faith and awarding attorney fees to Becker.

{¶ 3} We conclude that the alleged error in denial of DE's motion for summary judgment was moot or harmless, due to the judgment in Becker's favor, and the fact that the issues involved were not pure questions of law. Furthermore, the trial court did not err in denying DE's motion for directed verdict, as substantial competent evidence existed to support Becker's claims, and reasonable minds might reach different conclusions based on the evidence presented.

{¶ 4} The trial court also did not err in instructing the jury on Becker's claim for breach of contract. DE waived most of the alleged errors by failing to object, and there was no error, let alone plain error, in the instructions that were given. Finally, the trial court did not abuse its discretion by awarding attorney fees to Becker, given the jury's finding that DE acted in bad faith. Accordingly, the judgment of the trial court will be

affirmed.

## I. Facts and Course of Proceedings

**{¶ 5}** Construing the facts in favor of Becker,[1] the evidence was as follows. In 1972, Stephen Becker began his career as an installer for a heating and air conditioning company. Becker then went to work for Airtron as a sales engineer in 1982. He was later promoted to vice president of Airtron's Indianapolis division, and eventually, with a group of about 26 managers, purchased stock and formed an employee stock ownership plan.

**{¶ 6}** In May 1997, Becker and the other five remaining owners sold Airtron to GroupMAC. Becker then had a one-year employment agreement, but ended up staying until November 1998, at which time he retired. From 1998 to 2004, Becker and others ran a nonprofit organization called Character Council of Indiana, which did character training and consulting work for businesses. Becker worked at Character Council as a volunteer.

**{¶ 7}** In 2004, Eric Salzer recruited Becker to work as a senior vice president of consumer/services operations for Residential Services Group ("RSG"). Salzer had worked with Becker at Airtron and was the president and CEO of RSG at the time.[2]

---

[1] This is appropriate because DE has not asserted a manifest weight challenge, which would require weighing of evidence and determinations of credibility. *Buckeye Retirement Co., LLC v. Busch*, 2017-Ohio-4009, 82 N.E.3d 66, ¶ 40 (2d Dist.).

[2] Centrica U.S. Holdings was the parent company for RSG, which was a holding company for Airtron and other retail services. In 2004, after Becker was hired, DE took over or purchased RSG. While a number of different entities were involved in operating the business in which Becker was employed, this fact is essentially irrelevant, and the parties have used the names "Airtron" and "DE" interchangeably.

Salzer recruited Becker because Becker had a track record of outstanding performance when he worked at Airtron. Becker was placed in charge of a number of divisions, including the Airtron Indianapolis division.

{¶ 8} Becker was classified as an L-4, and such employees sign employment agreements. On September 24, 2004, Becker signed an employment agreement prepared by DE's legal department. Various provisions in the agreement covered matters like non-competition, intellectual property, bonuses, salary, benefits, and so on. Pertinent to the litigation was Article IX, which addressed termination.

{¶ 9} This article provided in Section 9.2, that if the company terminated Becker without cause, he would be entitled to 24 month's salary, plus any pro-rata accrued bonus and vacation pay to the date of termination. In addition, Becker was entitled to reimbursement for up to 18 months of COBRA premiums, and for additional premiums beyond that, if COBRA coverage ceased before the end of the 24-month salary continuation period. Under Section 9.1, Becker was allowed to terminate his employment and the agreement by providing three months' notice; in this situation, the company could choose to specify an earlier termination date, but would be liable for the outstanding portion of three months' salary, benefits, vacation, and perquisites.

{¶ 10} Section 9.4 involved termination by the company with cause and provided, in relevant part, as follows:

Notwithstanding anything contained in this Agreement, this Agreement and the employment of the Executive may be terminated by the Company for "Cause" by giving notice to the Executive. In such case, the Company shall have no further obligation to the Executive except for

payment of his annual base salary and unused vacation due and owing up to the date of termination. For purposes of this agreement, "Cause" shall mean that the Company, acting in good faith based upon the information then known to the Company, determines that the Executive:

* * *

(b) has engaged in acts of fraud, material dishonesty, or other acts of willful misconduct in the course of his duties hereunder * * *.

Plaintiff's Ex. 1, pp. 8-9.

{¶ 11} During the entire time that Becker worked for Airtron, both between 1982 and 1998, and between 2004 and May 3, 2016, Becker was never disciplined in any way. His annual reviews were never anything less than excellent, and he had more outstanding reviews than excellent reviews. Becker's division was also one of the most profitable, and Becker was highly thought of within the Airtron business. From 2004 to 2016, safety consciousness went up tremendously at Airtron and the company environment became a "safety culture."

{¶ 12} As a division manager, Becker was required to do a minimum number of random stop inspections, which were safety inspections. There was no written policy regarding the inspections, and Becker was the one who decided which job sites and employees would be inspected. The inspections were a surprise, because employees were not informed beforehand and were not supposed to know that Becker was coming. These inspections were intended to be positive learning experiences rather than an attempt to catch employees doing something wrong.

{¶ 13} On March 17, 2016, Becker happened to be in a particular subdivision,

spotted an Airtron truck, and decided to do a stop inspection. The employees he inspected that day were Brad Eads and Max Manifold. Before Becker got to the house where the truck was parked, he saw Eads "setting" an air conditioner, and noticed it was not level. When he pointed this out, Eads was resistant, but eventually acknowledged that it was not level. As Eads was finishing up the high voltage wiring, Becker also asked if Eads had done a lockout/tagout, and Eads said he had not.

**{¶ 14}** A lockout/tagout was a required procedure in all instances to prevent employees from receiving electric shocks that can be fatal. Failing to do a lockout/tagout was a serious safety violation. Eads was not receptive to Becker's comments and did not feel the lockout/tagout was needed because he was close to the electrical panel. Becker considered the lockout situation dangerous.

**{¶ 15}** While at the site, Becker also noticed that the Airtron truck was parked the wrong way on the street, that cones had not been set out, and that Eads was not wearing a hard hat. All these items were safety issues. Finally, there was a serious quality issue with Eads's refrigerant gauges. After the inspection, Becker noted what he found on the company's online system, but he did not discipline Eads. Protocol dictated that Eads's supervisor, Matt Eskew, would take care of discipline, and Becker spoke to Eskew about what he had found. Eskew indicated he would talk to Eads.

**{¶ 16}** Previously, Eads had been suspended for three days in 2015 for a safety violation involving pit-boards, which are placed in attics to ensure that individuals do not fall through ceilings into a home. DE had a progressive discipline system, as follows: verbal warning; written warning, second written warning, suspension, and then termination.

{¶ 17} Eskew did not administer any discipline to Eads. On March 31, 2016, Becker had an impromptu discussion with Eskew about whether Eads was teachable. He was concerned that Eskew had not handled the situation properly. Becker decided to do another stop inspection and headed to a worksite in Atlanta, Indiana, where Eads was supposed to be working. Becker was tight on time because he did not realize how far north the jobsite was. Becker had a 3:00 p.m. meeting in Indianapolis with some senior leaders and a builder, and being on time was important because Becker had called the meeting.

{¶ 18} When Becker arrived at the jobsite, the truck was again parked in the wrong direction, and no cones were out. Eads was inside a house, and Manifold was standing by a temporary electric pole. Neither employee wore a hard hat. Becker was disappointed and exasperated to see the same safety violations. He was also bothered that he was going to be late for his meeting.

{¶ 19} Manifold told Becker that they had just arrived and were not sure they had power at the site. Manifold then told Eads that Becker was there. When Eads came out of the house, Becker told Eads that he was "going to have your ass right here, right now." Trial Transcript ("Tr."), p. 677. Becker told Manifold to go inside the house. After going in, Manifold heard Becker yelling. He saw Becker poke Eads in the chest, and Eads take a step back. Manifold thought that Becker poked Eads one more time, but he could not see if contact was made. Eads was quite a bit heavier and taller than Becker.

{¶ 20} Becker indicated that he raised his voice at Eads, was unprofessional, and used profanity. He stated that residential construction was a very rough environment and profanity was part of the culture. He admitted losing his "cool" and stated that he

did touch Eads twice, with his finger. Becker denied pushing Eads. He did tell Eads that he was concerned that Eads was not teachable, that he had to comply with safety issues, and that if he wanted to quit, he should quit. Ultimately, Becker apologized to Eads for his unprofessionalism and profanity. The last thing he said was that either Eads had to be on the team or not.

{¶ 21} Becker then left and went to his meeting. After the meeting, he told some fellow employees that the inspection did not go well and that he that he had been the most upset he had been in a long time.

{¶ 22} Manifold testified that Eads never told him that he was harmed in any way. On the way back to the office, Eads spent most of the time talking to his wife, who was in human resources (HR) with a different company. Eads was upset and said he was going to get fired. Eads knew they had committed safety violations on March 17, and that particular incident was bad because it involved a lockout/tagout, which created a danger to employees.

{¶ 23} The next day, Eads filled out a written complaint against Becker and gave it to the division's safety manager, Mandi Larabee-Piper. Eads also made a complaint over a company hotline. According to Eads's written statement, Becker had poked him in the chest four or five times, had yelled at him, had used profanity, had said they never should have hired Eads, had said that Eads should quit, and had said that he (Becker) would be "gunning" for Eads.[3] Larabee-Piper showed the statement to Becker, and he admitted losing it on the job site. Becker told Larrabee-Piper that she should do what

---

[3] DE did not present testimony from Eads; instead, DE's employee relations manager, Kirsten McGarry, read Eads's statement at trial.

she needed to do, and to call his boss, Greg Faris.

{¶ 24} Becker testified that he was surprised that Eads had complained and that some parts of Eads's statement were true and other parts were false. Becker said he did not feel he had harassed Eads, but was trying to establish accountability for Eads's own good. He also testified that he told the HR investigator that there was no excuse for his own conduct, and still felt that way.

{¶ 25} Among other employment policies, DE had nondiscrimination, anti-harassment, and workplace violence prevention policies. Harassment included "any verbal or physical conduct designed or intended to disturb, threaten, intimidate, or coerce an employee, co-worker or any person working on behalf of DE." Plaintiff's Ex. 8, p. 1. In addition, the workplace violence prevention policy defined "violence" as: "the threatened, attempted or actual conduct of a person that causes or is likely to cause physical injury. This may include but is not limited to causing physical harm, threatening behavior, intimidation, coercion, abusive statements, direct or indirect threats/abuse – verbal or written, harassment, robbery, interpersonal employee conflicts, customer/employee conflicts, and/or violence that affect the workplace." Plaintiff's Ex. 10, p. 1.

{¶ 26} Eads's complaint was investigated by Kirsten McGarry, who had been with DE since 2010. During the investigation, McGarry interviewed Eads, Manifold, Becker, Eskew, and Larrabee-Piper. She also contacted Lisa Seeger, who had served as HR support for Airtron for many years. McGarry often consulted with Seeger, who had more knowledge about company practices, how Airtron applied its rules, and how Airtron had disciplined people in the past. Due to Seeger's background in Airtron's particular

business, McGarry felt it was important to solicit Seeger's opinion.

{¶ 27} Even after hearing that Becker had pushed Eads, Seeger recommended that Becker be given a written reprimand. After reviewing all the information, McGarry was also leaning toward a written reprimand or warning (the second step in the discipline process), and informed her supervisor, Johnathan Phillips, of that fact. Her recommendation was based on the level of the offense, Becker's long tenure at the company, and the fact that she was not aware of any prior discipline. After forming her initial basis for this recommendation, the only new fact that McGarry learned was that Becker's latest performance review was an "exceeds" expectations.

{¶ 28} Subsequently, two conference calls occurred concerning the investigation. The first call involved: McGarry; Nolan Gardner, an HR director; Scott Boose, a DE senior vice president; Greg Faris (who had replaced Eric Salzer); Zandra (Koeppel) Magarino, an HR vice president, and Manu Asthana (the most senior person in the company). No decision was made during this call, and McGarry was asked to follow up on specific areas. However, the only thing McGarry did after that was to ask Becker if there were any factors that would have explained his behavior. Becker mentioned the lack of "margin" in his life (meaning he was over-committed), and that he had some health concerns; however, he stressed that he was not offering those facts as an excuse.

{¶ 29} According to McGarry, she was asked for a copy of Becker's employment agreement at some point in the process. She could not recall if this was before or after the first conference call, nor could she recall who had requested it, other than that it was someone superior to her in the organization. However, McGarry did recall forwarding a copy of the agreement to DE's legal counsel, Sidney Watts, who was not involved in the

first conference call. Watts was part of the second conference call. During the second conference call, Manu Asthana decided to terminate Becker for willful misconduct.

{¶ 30} Becker was informed of his termination on May 4, 2016. However, DE asked him to stay until May 25, 2016, to assist DE with the transition. The day before the termination meeting, McGarry distributed a script for Becker's firing that had been prepared by her manager, Phillips. Among other things, the script stated that "If Steve [Becker] attempts to retire during the meeting tomorrow, we cannot accept it." Tr. at p. 272, discussing Ex. 21. McGarry indicated that DE was like other companies that allowed people to retire or resign at any time or for any reason; she said she did not recall why DE could not have accepted a retirement. DE also put out a statement indicating that Becker was "passing the torch" to another employee, which was not true; instead, he was terminated.

{¶ 31} On August 10, 2016, Becker filed this action against DE, asserting claims for breach of contract, intentional misrepresentation, breach of the duty of good faith and fair dealing, and unjust enrichment. Becker then filed an amended complaint on April 25, 2017, adding a claim for defamation. On May 30, 2017, DE filed a motion for summary judgment, which the trial court granted in part and denied in part in late July 2017. Specifically, Becker had conceded that summary judgment was appropriate on the unjust enrichment claim, and the court granted summary judgment on the claim for intentional misrepresentation. However, the court concluded that genuine issues of material fact existed concerning the claims for breach of contract, breach of the duty of good faith and fair dealing, and defamation.

{¶ 32} Following a jury trial, the jury found in Becker's favor on his claims for breach

of contract and breach of the duty of good faith and fair dealing, and in DE's favor on the defamation claim.    In answers to special interrogatories, the jury also found that DE had breached its obligations by terminating Becker without cause, and that DE had acted in bad faith.    As damages, the jury awarded Becker $655,733.44.    The trial court later considered Becker's motion for attorney fees and costs.    The court awarded him $43,476.02 in prejudgment interest from May 26, 2016 through March 16, 2018; $217,639.60 for attorney fees, assessed as costs, with interest of $1,111.45 from January 31, 2018 through March 16, 2018; additional post-judgment interest as provided by Ohio law through the date of payment; and the costs of the action.    DE timely appealed from the judgment of the trial court and raised four assignments of error.

## II.   Did the Trial Court Err in Denying Summary Judgment to DE?

{¶ 33} DE's First Assignment of Error states that:

The Trial Court Erred in Denying Appellant's Summary Judgment Motion on Appellee's Claims for Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing.

{¶ 34} Under this assignment of error, DE contends that we may review the trial court's denial of its motion for summary judgment based on a pure issue of law. According to DE, such a pure issue of law exists because Becker failed to comply with his obligations under the contract, which prevented him from establishing an essential element of his breach of contract claim.    DE further argues that the trial court erred when it found that the contract was ambiguous.

{¶ 35} Under well-established law, any errors a trial court makes in denying

summary judgment motions are harmless or moot if a later trial on the same issues demonstrates that genuine issues of material fact existed to support a judgment in favor of the party that opposed the summary judgment motion. *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150, 642 N.E.2d 615 (1994), syllabus. *Whittington* involved a declaratory judgment action brought by an insurer to determine coverage for an automobile accident. *Id*. at 151. After the insurer's motion for summary judgment was denied, the jury found that coverage was available for the party claiming to be an insured. *Id*. at 153-154.

{¶ 36} On appeal, the insurer claimed that the trial court erred in denying its motion for summary judgment. However, the Supreme Court of Ohio explained that even if the record at the time of the summary judgment motion did not reflect genuine issues of material fact, the evidence at trial showed genuine issues of material fact, and the facts determined by the jury showed that the insurer was clearly liable. *Id*. at 155-156. The court then commented that:

> Under these circumstances, it would seem incongruous to now say that the trial court committed reversible error in denying Continental's motion. Any error in the denial of the motion was rendered moot or harmless since a full and complete development of the facts at trial (as opposed to the limited factual evidence elicited upon discovery) showed that appellants were entitled to judgment. In this regard, substantial justice would clearly not be served by setting aside the jury's findings and the final judgment of the trial court.

*Whittington* at 156-157. *Accord Arnett v. Bardonaro*, 2d Dist. Montgomery No. 25371,

2013-Ohio-1065, ¶ 30; *Isom v. Dayton Power & Light Co.*, 2d Dist. Montgomery No. 23911, 2010-Ohio-4756, ¶ 23.

**{¶ 37}** In reaching this holding, the Supreme Court of Ohio distinguished a prior case, which had allowed such review, by noting that the case involved a "pure question of law." *Whittington* at 158, discussing *Balson v. Dodds*, 62 Ohio St.2d 287, 405 N.E.2d 293 (1980). Thus, where only a pure issue of law is involved, a denial of summary judgment may be considered.

**{¶ 38}** The elements of a breach of contract claim are "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Doner v. Snapp*, 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (2d Dist.1994). However, as Becker has noted, "a breach of one of several terms in a contract does not discharge the obligations of the parties to the contract, unless performance of that term is essential to the purpose of the agreement, and default by a party who has substantially performed does not relieve the other party from performance." *Hansel v. Creative Concrete & Masonry Constr. Co.*, 148 Ohio App.3d 53, 2002-Ohio-198, 772 N.E.2d 138, ¶ 11 (10th Dist.). *Accord Fry, Inc. v. Cossett*, 2d Dist. Clark No. CA-1797, 1983 WL 4967, *3 (Sept. 28, 1983). Furthermore, in order "[f]or the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract." *Hansel* at ¶ 12.

**{¶ 39}** The employment agreement in this case was signed in September 2004, and Becker performed under the contract for nearly 12 years; by all accounts, he performed very successfully and without discipline. There was no suggestion or evidence that Becker's actions on March 31, 2016, destroyed the value or purpose of the

contract.

{¶ 40} In *O'Brien v. Ohio State Univ.*, 10th Dist. Franklin No. 06AP-946, 2007-Ohio-4833, which also involved a terminated employment contract, the court noted that "[t]he determination of whether a party's breach of a contract was a 'material breach' is generally a question of fact." *Id.* at ¶ 11. The court also stressed that "[t]he reasoning behind this principle is that to determine whether a party's breach was material requires, inter alia, an examination of the parties' injuries, whether and how much the injured parties would or could have been compensated, and whether the parties acted in good faith. * * * All of these inquiries turn on subjective facts." *Id.*

{¶ 41} In *O'Brien*, the court further observed that "[a]t common law, a 'material breach' of contract is a party's failure to perform an element of the contract that is 'so fundamental to the contract' that the single failure to perform 'defeats the essential purpose of the contract or makes it impossible for the other party to perform.' " *Id.* at ¶ 56, quoting 23 *Williston on Contracts*, Section 63:3.

{¶ 42} Again, the evidence indicates that Becker did substantially perform under the employment agreement, and whether his alleged violation of a company policy defeated the agreement's essential purpose turned on subjective facts. This was not a question of law.

{¶ 43} As a final matter, we note that in the joint final pretrial statement, which was filed shortly before trial, the parties jointly identified various "issues of fact and/or mixed questions of fact and law." Among these issues were: "(a) Whether Plaintiff engaged in willful misconduct as that term is used under the Employment Agreement," and "(b) Whether Plaintiff's employment was properly terminated for cause under the Employment

Agreement." Doc. #45, Joint Pretrial Statement, filed on October 4, 2017, p. 2. These assertions are inconsistent with the contention that only pure issues of law were involved.

{¶ 44} Accordingly, the issue was not a "pure question of law," and the jury verdict in Becker's favor rendered moot the issue of whether the trial court erred in denying summary judgment. This is not to say that the trial court erred in denying the summary judgment motion; the point is that any alleged error in that vein is moot due to the verdict in Becker's favor.

{¶ 45} In view of this conclusion, we do not need to consider DE's argument about ambiguity, but will discuss it when we evaluate the Second Assignment of Error. Based on the preceding discussion, the First Assignment of Error is overruled.

III. Did the Trial Court Err in Failing to Grant DE's Motion for Directed Verdict?

{¶ 46} DE's Second Assignment of Error states that:

The Trial Court Erred in Failing to Direct a Verdict in Favor of Appellant on Appellee's Claims for Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing.

{¶ 47} Under this assignment of error, DE contends that the trial court erred in failing to grant its motion for directed verdict. According to DE, Becker's theory at trial that he was discharged in bad faith so that DE could avoid paying him the amounts specified in the employment agreement was based solely on the fact that an unidentified individual asked McGarry to obtain a copy of Becker's contract, which she then forwarded to legal counsel. DE further notes that witnesses who participated in the discussions about the termination decision testified that they did not review the contract and that it

was not discussed. DE also made this assertion in connection with its argument on the denial of its motion for summary judgment, i.e., stating that beyond counsel's "naked assertions," no evidence supported this theory. After considering the evidence, we disagree.

{¶ 48} Decisions on directed verdict motions are reviewed de novo. *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 257, 741 N.E.2d 155 (2d Dist.2000). The Supreme Court of Ohio has said that:

> When a motion for a directed verdict is entered, what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to the jury. This does not involve weighing the evidence or trying the credibility of witnesses; it is in the nature of a demurrer to the evidence and assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence. The evidence is granted its most favorable interpretation and is considered as establishing every material fact it tends to prove. The "reasonable minds" test of Civ.R. 50(A)(4) calls upon the court only to determine whether there exists any evidence of substantial probative value in support of that party's claim.

*Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68-69, 430 N.E.2d 935 (1982).

{¶ 49} For the reasons previously discussed and for additional reasons that follow, we conclude that the trial court properly denied DE's motion for directed verdict.

{¶ 50} Initially, we agree with the trial court that the use of the term "willful misconduct" in the employment agreement is ambiguous. As was noted, the pertinent

provision is Section 9.4(b) of the agreement, which allows DE to terminate Becker with cause.   Under the agreement, this means that "the Company, acting in good faith based upon the information then known to the Company, determines that the Executive: * * * has engaged in acts of fraud, material dishonesty, or other acts of willful misconduct in the course of his duties hereunder."   Plaintiff's Ex. 1 at pp. 8-9.

{¶ 51} Although the agreement defines numerous terms in Section 1.1, it does not define "willful misconduct."   "Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations."   *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 55, 716 N.E.2d 1201 (2d Dist.1998).

{¶ 52} An argument could be made that willful misconduct could refer to many kinds of actions, which were undefined, or it could be restricted to the type of conduct that was like the conduct that was specifically named.   This creates an ambiguity as to exactly what conduct would be required.

{¶ 53} Since the agreement used the term "*or other acts* of willful misconduct," it can be read, under an established principle of construction, to indicate that willful misconduct was intended to relate back and be confined to the same general nature as the previous, more specific terms, which were fraud and material dishonesty.   *See, e.g.*, *George H. Dingledy Lumber Co. v. Erie R. Co.*, 102 Ohio St. 236, 245, 131 N.E. 723 (1921) (under the doctrine of ejusdem generis, "where an enumeration of specific things is followed by some more general word or phrase, such general word or phrase should be held to include only things of the same general nature as those specified").

{¶ 54} Eric Salzer, who hired Becker and signed the employment agreement on

DE's behalf, testified that willful misconduct alluded to fraud, theft or dishonesty, as in "willfully, intentionally, willfully defrauding the company or stealing." Tr. at p. 589. In a footnote in its brief, DE objects to this extrinsic evidence, due to DE's contention that the contract was unambiguous. However, DE failed to object to this testimony at trial, and any error has been waived. *See, e.g.*, *State ex rel. Holwadel v. Hamilton Cty. Bd. of Elections*, 144 Ohio St.3d 579, 2015-Ohio-5306, 45 N.E.3d 994, ¶ 50 ("to preserve an issue for review, the party must make a *timely* objection") (Emphasis sic).

**{¶ 55}** Even if an objection had been made, no error occurred, because the agreement was ambiguous. *See, e.g., United States Fid. & Guar. Co.* 129 Ohio App.3d at 55, 716 N.E.2d 1201 (where a contract is ambiguous, the court may properly consider extrinsic evidence).

**{¶ 56}** Moreover, Salzer's testimony simply coincides with the agreement's link of other willful misconduct to the specific enumerated acts. There is no dispute about the fact that DE's legal counsel prepared the agreement, and Ohio law is settled that ambiguities in contracts are construed strictly against the drafter. *See Zimmerman v. Eagle Mtge. Corp.*, 110 Ohio App.3d 762, 778, 675 N.E.2d 480 (2d Dist.1996); *Doe v. Ronan*, 127 Ohio St.3d 188, 2010-Ohio-5072, 937 N.E.2d 556, ¶ 49. If DE wished to clarify that willful misconduct related to a different type of act, it could have defined the term. DE also could have used language that did not link this general term to the type of acts specifically listed.

**{¶ 57}** Our analysis could conclude here, because no evidence was provided at trial that Becker engaged in any acts of fraud, theft, or material dishonesty. However, we will briefly consider DE's contention that no evidence was presented at trial to support

Becker's theory of the case. Again, we disagree.

{¶ 58} It is true that no witness admitted that DE terminated Becker in bad faith in order to avoid paying him the amounts specified in the agreement. This is hardly surprising, since the witnesses at trial were primarily either current DE employees or former employees who were still employed in the industry. Even if this were otherwise, however, direct evidence was not required. "Circumstantial evidence is not inherently less reliable or certain than direct evidence. Both types of evidence inherently possess the same probative value, and reasonable inferences may be drawn from both direct and circumstantial evidence." *Sellers v. Whitt*, 2d Dist. Greene No. 91 CA 96, 1993 WL 451575, *5 (Nov. 3, 1993), citing *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), and *Donaldson v. N. Trading Co.*, 82 Ohio App.3d 476, 483, 612 N.E.2d 754 (10th Dist.1992).

{¶ 59} Facts were presented from which a reasonable juror could conclude that DE's termination decision was made in bad faith to prevent Becker from collecting the amounts due for termination without cause. *See Ruta*, 69 Ohio St.2d at 68-69, 430 N.E.2d 935. As noted above, the investigating human resources person, McGarry, sought advice from Seeger, due to Seeger's established knowledge of the discipline history and process at Airtron. Even after being informed that Becker had "pushed" Eads, Seeger recommended a written warning.

{¶ 60} After reviewing all the information, McGarry was also leaning toward a written reprimand (the second step in the discipline process), and informed her supervisor, Johnathan Phillips, of that fact. Her recommendation was based on the level of the offense, Becker's long tenure at the company, and the fact that she was not aware

of any prior discipline. After forming her initial recommendation, the only new fact that McGarry learned was that Becker's latest performance review was an "exceeds" expectations, but she changed her recommendation to termination.

**{¶ 61}** McGarry never offered an explanation for her change in recommendation, other than that her supervisor told her to consider the issue more globally. However, McGarry admitted that she already knew of the need to do this when she made her initial recommendation. Tr. at pp. 671-672. In addition, during the discipline investigation, a person superior in the organization asked McGarry to obtain a copy of Becker's employment agreement; she did so, and forwarded it to DE's legal counsel. Different inferences could arise from this. One inference is that decision-makers wanted to see the agreement simply for proper business reasons. However, an equally plausible inference is that the considerable amount of potential payout factored into the termination decision. This is particularly plausible, since DE did not provide any evidence as to consideration of willful misconduct for cause under the employment agreement.

**{¶ 62}** Specifically, Nolan Gardner, who participated in both conference calls, did not recall any discussions between the workplace contact policy and how that applied to willful misconduct. Tr. at p. 626. He further stated that it did not matter to him whether Becker's conduct was intentional or willful; it only mattered that it happened. *Id.* at p. 629.

**{¶ 63}** Similarly, McGarry, who investigated the case and participated in both conference calls, stated that she did not have any discussion about whether the company had cause to terminate Becker's employment under his contract. *Id.* at p. 658. McGarry also said that she did not know why Becker was deemed to have engaged in willful

misconduct and denied severance because she was not involved in those discussions. *Id.* at p. 659. However, the only discussions DE witnesses disclosed were those that occurred during the conference calls. During her testimony, McGarry acknowledged that no witness who was involved in the decision to deny Becker his benefits under the agreement had come in to testify. *Id.* at p. 669. After McGarry finished testifying, DE did not call any such witness. Scott Boose, who was involved in the conference call and had testified earlier, did not discuss termination for cause based on willful misconduct or how it was considered in relationship to Becker's conduct.

{¶ 64} Finally, the remaining individuals who participated in the conference calls, including Asthana, who made the termination decision, did not testify. Since there is no indication that termination for cause based on "willful misconduct" was discussed as part of the termination decision, it would be very difficult to conclude that DE made a good faith decision to terminate Becker for willful misconduct.

{¶ 65} According to DE, triers of fact may not stack inferences on top of inferences. However, that is not what happened. In *Sellers*, we noted Ohio's extreme limitation of the rule prohibiting stacking of inferences. *Sellers*, 2d Dist. Greene No. 91 CA 96, 1993 WL 451575, at *6. We stressed that the rule:

> merely prohibits * * * "the drawing of one inference *solely and entirely* from another inference, where that inference is unsupported by any additional facts or inferences drawn from other facts. But the rule does not forbid the use of parallel inferences in combination with additional facts. Nor does it prohibit the drawing of multiple inferences separately from the same set of facts. Because reasonable inferences drawn from the evidence are an

essential element of deductive reasoning process by which most successful claims are proven, the rule against stacking inferences must be strictly limited."

(Emphasis sic.)   *Id.*, quoting *Donaldson*, 82 Ohio App.3d at 481, 612 N.E.2d 754.

{¶ 66} In addition to the above evidence, other facts that indicated an improper motive on the part of DE included the "script" that McGarry distributed the day before the termination meeting, instructing that Becker could not be permitted to retire.   As noted, McGarry did not recall any reason why an employee could not be allowed to resign or retire.   Furthermore, the employment agreement provided Becker with certain payments if he chose to terminate his employment agreement.

{¶ 67} Another set of facts, construed favorably to Becker, provided further evidence supporting Becker's theory of the case.   McGarry testified that Airtron did not have a zero tolerance policy, that it always depended on the facts and circumstances, and that the company liked discipline to be consistent.   However discipline for what DE contended was "willful misconduct" (under its own definition, not the definition in Becker's contract) was not consistent.

{¶ 68} For example, a celebratory company dinner occurred in Las Vegas, with around 20 to 25 senior DE employees in attendance, including division vice presidents and regional managers, all the way up to Eric Salzer, the RSG president.   At the dinner, which was in a public restaurant, one vice president was engaged in a drinking contest with another vice president.   One of the individuals, a senior vice president, got up on a table and spiked a drinking glass onto the table, like someone who would spike a football after making a touchdown.   The glass shattered, and Seeger, who was also present, was

cut by the glass. In addition, the vice president used profanity. However, Salzer decided to only verbally reprimand the vice president, due to the employee's strong work ethic and track record of performing well.

{¶ 69} The same night, another high-ranking DE employee threatened employees of Carrier, which was an important Airtron vendor. Salzer testified that the encounter was physical. However, Salzer did not fire this employee for willful misconduct or terminate him for cause. His decision was based on the employee's length of service, outstanding record, record for being honest, and the fact that it was a "one-off" situation. Salzer required the employee to write a letter of apology and verbally dressed him down.

{¶ 70} In 2006, McGarry investigated a vice president of an Airtron division in North Carolina, who was accused of having personal discussions in the workplace about a girlfriend, which made women in the office uncomfortable. In addition, the vice president had entered his girlfriend in the company's system as a vendor, which the company thought was a conflict of interest. This vice president was not in the office as often as DE wanted him to be, and he was also bringing his girlfriend into the office. He received only a written reprimand.

{¶ 71} Finally, Eads was given only a warning with respect to the safety violations that took place on March 31, 2016, even though he previously had been suspended for violations. When McGarry was asked which was more serious – "poking someone in the chest a few times and not causing any injury or committing four safety violations of the type that Eads committed," McGarry responded that "safety violations and harassment and intimidation and physical touch can all be equal in terms – in seriousness." Tr. at p. 237. When McGarry was asked why, if these violation can all be equal in seriousness,

"the guy with the perfect record is fired and the guy with the imperfect record given a warning", McGarry's response was only, "That was the decision that was made." *Id.*

{¶ 72} In view of the above discussion, the trial court did not err in denying DE's motion for directed verdict. Substantial competent evidence existed to support Becker's claims, " ' "upon which evidence reasonable minds might reach different conclusions." ' " *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 119, 671 N.E.2d 252 (1996), quoting *Strother v. Hutchinson*, 67 Ohio St.2d 282, 284-285, 423 N.E.2d 467 (1981) (other citations omitted.).

{¶ 73} Accordingly, the Second Assignment of Error is overruled.

IV. Did the Trial Court Err in Instructing the Jury

on the Breach of Contract Claims?

{¶ 74} DE's Third Assignment of Error states that:

The Trial Court Erred in Instructing the Jury on Appellee's Breach of

Contract Claims.

{¶ 75} Under this assignment of error, DE argues, as it did before, that to succeed on his breach of contract claim, Becker had to prove that he fulfilled his contractual obligations. DE, therefore, contends that the trial court erred by failing to include a jury instruction that DE proposed on breach of contract, and by also failing to include an interrogatory asking the jury to find whether Becker proved that he performed all his obligations under the contract. In addition, DE contends that the trial court excluded express terms in the contract, and erred in refusing to instruct the jury on the dictionary meaning of the terms "willful" and "misconduct."

{¶ 76} Trial courts have discretion whether to give requested jury instructions "based on the dispositive issues presented during trial," and we review the court's decision for abuse of discretion. *Renfro v. Black*, 52 Ohio St.3d 27, 30, 556 N.E.2d 150 (1990); *State v. Elliott*, 2d Dist. Montgomery No. 26104, 2014-Ohio-4958, ¶ 22. " 'Abuse of discretion' has been described as including a ruling that lacks a 'sound reasoning process.' " *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). This type of review is deferential and does not let us substitute our judgment for that of the trial court. *Id.*

{¶ 77} As a general rule, "a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. Parties are only entitled to have their "proposed jury instructions given when they are correct statements of the law, pertinent to the evidence in the record or to material issues, and are timely presented and not already included in the substance of the jury charge." *Elliott* at ¶ 23, citing *State v. Guster*, 66 Ohio St.2d 266, 269, 421 N.E.2d 157 (1981).

{¶ 78} When a trial court considers whether to use a jury instruction, it has sound discretion "to refuse to admit proposed jury instructions that are either redundant or immaterial to the case." *Anousheh v. Planet Ford, Inc.*, 2d Dist. Montgomery No. 21960, 2007-Ohio-4543, ¶ 15. Furthermore, " '[t]he trial court need not give a proposed instruction in the precise language requested by its proponent, even if it properly states an applicable rule of law. The court retains discretion to use its own language to

communicate the same legal principles.' " *Walker v. Conrad*, 2d Dist. Montgomery No. 19704, 2004-Ohio-259, ¶ 21, quoting *Youssef v. Parr, Inc.*, 69 Ohio App.3d 679, 591 N.E.2d 762 (8th Dist.1990).

**{¶ 79}** We have held that, to show reversible error in refusing to give proposed instructions, "the proponent of the error must make a two part showing.  First, he must show that the trial court's refusal to give a proposed jury instruction was an abuse of discretion; that is, the refusal was arbitrary, unreasonable, or unconscionable. * * * Second, the proponent must demonstrate that he was prejudiced by the court's refusal to give the proposed instruction.  In this connection we note that prejudicial error occurs only if the alleged instructional flaw cripples the entire jury charge."  (Citations omitted). *Jaworowski v. Med. Radiation Consultants*, 71 Ohio App.3d 320, 327-328, 594 N.E.2d 9 (2d Dist.1991).  *Accord Witzmann v. Adam*, 2d Dist. Montgomery No. 05-CV-4086, 2011-Ohio-379, ¶ 73; *Masden v. CCI Supply, Inc.*, 2d Dist. Montgomery No. 22304, 2008-Ohio-4396, ¶ 22.

**{¶ 80}** After reviewing the jury instructions, we conclude that the trial court did not abuse its discretion in failing to give all of Becker's proposed instructions, nor was there any evidence of prejudice.

**{¶ 81}** As was noted previously, in the joint pretrial statement, the parties agreed to the contested issues of fact and/or mixed questions of fact and law.   As pertinent here, the issues were:

(a)   Whether Plaintiff engaged in willful misconduct as that term is used in the Employment Agreement.

(b)   Whether Plaintiff's employment was properly terminated for

cause under the Employment Agreement.

(c) Facts relating to whether Defendant breached the Employment Agreement with Plaintiff.

(d) Facts relating to whether Direct Energy breached the implied covenant of good faith and fair dealing under the Employment Agreement.

Doc. #45, Joint Pretrial Statement at pp. 2-3.

**{¶ 82}** The only contested legal issue other than those implicit in the above contested factual issues was whether the alleged defamatory statement (about Becker "passing the torch") was defamation per se or per quod – an issue that is irrelevant since DE prevailed on Becker's defamation claim.

**{¶ 83}** According to DE, the trial court misconstrued the contract even before opening statement. The court and the parties discussed the contract prior to opening statements, where the following exchange occurred:

THE COURT: For the Defendant to prevail on the breach of contract case, the jury would have to respond to interrogatories or verdicts, however we set it up, that A, the company acted in good faith –

MS. NEWCOMB (counsel for DE): To find in the company's favor?

THE COURT: Yes.

MS. NEWCOMB: Yes, Yes.

THE COURT: And B, determined that it was willful misconduct.

MS. NEWCOMB: No, I think they're together. I think * * * the resolution of this depends on the language that the parties chose to put in the agreement.

THE COURT: So that's what I asked you out of the gate.

* * *

THE COURT: What you're saying and this is what has me confused. What you seem to be saying to me is, as long as you've acted in good faith, you're good to go.

MS. NEWCOMB: Well, I think that's what the contract says, how the contract defines cause. If we have cause.

THE COURT: So if you're – even if we all conclude that it was not willful misconduct. Let's assume he clapped his hands and that was the alleged willful misconduct.

* * *

THE COURT: From your perspective, as long as * * * the company acted in good faith when they discharged him, that would be okay.

MS. NEWCOMB: According to the contract, yes.

THE COURT: Yeah, see, that's just not right, how I see it.

MR. FREKING (counsel for Becker): And Your Honor, I would say, just by the very nature that we're struggling with what that means –

THE COURT: I mean the objective of the trial * * * [Ms. Newcomb], is to focus on the misconduct, right?

MS. NEWCOMB: Well, it's to determine whether the company had cause to terminate him for –

THE COURT: Right.

MS. NEWCOMB: -- willful misconduct

THE COURT: Right.

MS. NEWCOMB: And to understand what cause is, you have to look at the definition in the contract.

\* \* \*

MS. NEWCOMB: You know, *it would be no different than the statement you read to the jury earlier. That our position is that we determined in good faith, based on the information available to us, that he engaged in willful misconduct, yes. It's consistent with what you're already –*

THE COURT: Yeah.

MS. NEWCOMB: *Read to the jury*.

(Emphasis added.) Tr. at pp. 162-164.

{¶ 84} The statement that the court previously read during the court's voir dire of the jury, was as follows:

This is a case that involves claims for breach of contract, breach of the covenant of good faith and fair dealing, and defamation. The Plaintiff, Stephen Becker, claims that the Defendant – the Defendant in this case is called Direct Energy – breached the terms of his written employment agreement when it fired him and that its decision to do so was made in bad faith to avoid paying him compensation and other benefits under his contract. Plaintiff also claims that the Defendant defamed him by making false statements about his departure from the company that injured him. Defendant denies these allegations.

*The Defendant asserts that it had cause to terminate the Plaintiff for engaging in willful misconduct, pursuant to the terms of the written contract, and that its decision to fire Plaintiff was made in good faith based on the information then known to it.* Defendant further denies that it defamed Plaintiff.

(Emphasis added.) Tr. at p. 8.

{¶ 85} Since DE agreed with the statement that the court made to the jury about the case, the trial court did not misconstrue the contract. During DE's opening statement, counsel specifically referred to the contract and its contention that DE had "determined in good faith, based on the information that was known to them at the time, that Mr. Becker had, in fact engaged in willful misconduct and that he should be fired for cause." *Id.* at pp. 198-199. DE's counsel also talked about accountability and that Becker had admitted violating DE's policies, but thought he should "get off with a slap on the wrist, a verbal warning, a written warning," and "was unwilling to accept the consequences of his actions." *Id.* at p. 199.

{¶ 86} After the presentation of evidence ended, the trial court and parties had a lengthy discussion of the most updated version of the jury instructions. *See* Tr. at pp. 712-774. During this discussion, DE appears to have had no objections to the following parts of the instructions:

(1) The presentation of issues (p. 715).

(2) The recitation of undisputed facts (p. 719).

(3) The statement of what DE alleged and the recitation of the factual issue regarding defamation (with a minor tweak) (pp. 720-721 and

731-732).

    (4)   The burden of proof (p. 733).

    (5)   Evidence and inferences (p. 733).

    (6)   The instruction on breach of contract, after some discussion (pp. 733-738).

    (7)   The language about the parties' intentions (p. 739; *compare* actual instruction given to jury, p. 831).

    (8)   Circumstances in the employment agreement about terminating Becker's employment (p. 740; *compare also* actual instruction given to jury, p. 831).

    (9)   The instruction on parties to contracts being bound by good faith and fair dealing (pp. 749-750).

    (10)   The instruction on good faith (pp. 751-753).

    (11)   The damages instruction (pp. 753-754).

    (12)   Defamation instructions (pp. 756-757).

    (13)   The interrogatories the court prepared, with (according to DE's counsel), "the exception of a few just minor edits" (p. 760).

    (14)   The verdict forms (pp. 766-772).

**{¶ 87}** Furthermore, at pp. 722-731 of the transcript, the parties discussed an instruction on the issue of fact for the jury to decide regarding Becker's conduct. At that point, *both sides* agreed to language suggested by DE, i.e., that the issue of fact for the jury to decide was "whether or not Mr. Becker's conduct with respect to Mr. Eads, constituted an act of willful misconduct, and whether Mr. Becker's employment was

properly terminated for cause." Tr. at p. 731. This was the language the court used when it instructed the jury. *See id.* at p. 825.

**{¶ 88}** The matters that DE did object to include the following items:

(1) The court's instruction on agency (pp. 716-719).

(2) The use of three "alleges" in the recitation of the contested issues of facts (based on repetitiveness) (pp. 719-720).

(3) Exclusion, in an instruction regarding interpretation of contract language, of the entire definition of cause, which stated that " 'Cause' shall mean that the Company, acting in good faith based upon the information then known to the Company, determines that the Executive: * * * has engaged in acts of fraud, material dishonesty or other acts of willful misconduct in the course of his duties hereunder" (pp. 740-748; *compare* actual instruction given at p. 832, lines 7-13).

(4) Defining fraud and material dishonesty by using definitions taken from Ohio Jury Instructions ("OJI") (pp. 748-749).

(5) Elimination of an instruction on nominal damages (p. 755).

**{¶ 89}** After the conference, the court printed a final version of the instructions, interrogatories, and verdict forms, and gave them to the parties the next day. At that time, the court asked for further objections, and DE renewed its objection to including the OJI definitions, particularly with respect to fraud. Tr. at pp. 777-779. DE also suggested a change to an interrogatory on punitive damages (which is irrelevant to this appeal), and Becker agreed. *Id.* at pp. 779-780.

**{¶ 90}** Based on the above facts, it is clear that the trial court instructed the jury as

the parties had generally agreed, subject to the few objections DE made. Whether or not DE proposed a specific instruction on breach of contract prior to trial, the fact is that DE agreed to the instruction that was given. DE did not ask the court during the charge conference to instruct the jury as to Becker's failure to perform under the contract.

{¶ 91} The same point is true with respect to the interrogatories, as DE agreed to them as well. Accordingly, there is no merit to DE's argument that the court erred by failing to instruct the jury as to Becker's performance under the contract or with respect to a special interrogatory asking the jury to decide if Becker performed all his obligations under the contract. DE waived these points by explicitly agreeing to the pertinent instructions and interrogatories. *Goldfarb v. The Robb Report, Inc.*, 101 Ohio App.3d 134, 145, 655 N.E.2d 211 (10th Dist.1995) (defendant who agreed to instructions cannot contend on appeal that standard for breach of contract in instructions was erroneous); *McKinley v. Supermet, Div. of Stanadyne, Inc.*, 2d Dist. Montgomery No. 8591, 1984 WL 3840, *1 (Aug. 27, 1984); *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209, 436 N.E.2d 1001 (1982).

{¶ 92} In *Schade*, the court noted that if wavier occurs, courts can consider plain error, which is noticed with " 'utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Schade* at 209, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. No such circumstances exist here. The jury was instructed on the points in question as DE expressly agreed; doing what a party asks does not involve a manifest miscarriage of justice.

{¶ 93} DE also contends that the trial court rewrote the contract by striking the

contractually agreed-upon definition of "cause" for the termination and by precluding counsel from mentioning the "good faith" language in the contract while making its closing argument. This is simply not correct.

**{¶ 94}** At the pages of the transcript that DE cites (pp. 164 and 729), the trial court did not state that DE would be precluded from arguing its own good faith in closing. Moreover, as we noted, DE did, in fact, agree to the trial court's statements about the contract during voir dire. DE also discussed this issue in its opening statement. DE then agreed with the instructions on good faith and breach of contract, and, itself, formulated the statement that the issue of fact for the jury to decide was "whether or not Mr. Becker's conduct with respect to Mr. Eads, constituted an act of willful misconduct, and whether Mr. Becker's employment was properly terminated for cause." Tr. at p. 731. This is the instruction the court gave to the jury. *Id.* at p. 825.

**{¶ 95}** Furthermore, the trial court instructed the jury on the specific definition of "cause" in the employment agreement, and twice stated that the determination must be made in good faith. *See* Tr. at pp. 824 and 825.

**{¶ 96}** DE also spent substantial time in closing discussing DE's thoughtful and deliberate decisions; the thoroughness and extensiveness of its investigation; the reasons why DE decided to terminate Becker; why DE's decision to terminate Becker was "risky" for DE because it would mean losing profit; DE's lack of intention to do a "money grab" and its lack of bad faith; DE's commitment to "treating people with dignity and respect"; how DE treated Becker with dignity and respect; the inappropriate and wrongful nature of Becker's actions; the fact that DE's code of conduct defined proper and improper conduct and that those policies were incorporated into Becker's employment contract, which the

jury would have; Becker's willful misconduct; and the need for Becker to be held accountable. *See* Tr. at pp. 799, 800, 801, 802, 804-805, 808, 810-811, 813, and 816.

**{¶ 97}** In addition, DE stressed that the jury could "read the definition of cause" when it took a look at Becker's employment contract. *Id.* at p. 801. DE was not precluded from commenting on its own good faith in making the employment decision.

**{¶ 98}** DE's third argument regarding the jury instructions is that the trial court erred in failing to instruct the jury with dictionary definitions of willful and misconduct, and by defining the terms fraud and material dishonesty based on OJI instructions, not from the dictionary. DE did preserve an objection to this, as noted above. As support for this argument, DE first contends that the trial court improperly concluded that the contract was ambiguous. We have already rejected that argument.

**{¶ 99}** DE next argues that there was no indication in the contract that the parties intended to use legal definitions for fraud and material dishonesty. Additionally, DE contends that the instructions effectively shifted the burden of proof from Becker to DE.

**{¶ 100}** As we noted earlier, DE drafted the agreement, and ambiguities in contracts are construed strictly against the drafter. *Zimmerman*, 110 Ohio App.3d at 778, 675 N.E.2d 480. In addition, we observed that the agreement defined various terms, but did not define "willful misconduct." We then applied principles of construction (ejusdem generis) to conclude that the meaning of willful misconduct was intended to relate back and be confined to the same general nature as the previous, more specific terms, which were fraud and material dishonesty. *George H. Dingledy Lumber Co.*, 102 Ohio St. at 245, 131 N.E. 725. DE agreed with this principle during discussion of the jury instructions. Tr. at pp. 747-748.

{¶ 101} In its briefs, DE contends that by including the definitions of fraud and material dishonesty in the jury instructions, and through its various rulings, the trial court shifted the burden from "DE having the discretion to terminate Becker for Cause if it determined in good faith based on the available information that he engaged in willful conduct" to "DE *only* being able to terminate Becker for Cause if it could prove he engaged in legal fraud or legal material dishonesty." (Emphasis sic.) Brief of Appellant, p. 28; Reply Brief of Appellant, p. 13.

{¶ 102} However, the trial court did not instruct the jury that it was required to find that Becker committed fraud or material dishonesty. Instead, the court simply said that "the terms fraud or material dishonesty *may* be instructive regarding the seriousness required for behavior * * * to constitute an other act of willful misconduct." (Emphasis added.) *Id*. at p. 832. This would be consistent with the contract and the principle of ejusdem generis.

{¶ 103} As an additional matter, after defining these terms, the trial court stated that: "Thus, you may consider that an act of willful misconduct is misconduct committed voluntarily and intentionally, not something that is by accident or neglect." *Id*. at 833. The dictionary definition of "willful" is "done deliberately: INTENTIONAL." Mirriam-Webster, https://www.merriam-webster.com/dictionary/willful (accessed Sept. 25, 2018). "Misconduct" is defined as "intentional wrongdoing," and "improper behavior." Mirriam-Webster, https://www.merriam-webster.com/dictionary/misconduct (accessed Sept. 25, 2018). These definitions are consistent with the trial court's instructions.

{¶ 104} As a final matter, we note that DE contends that, if the trial court had used the express terms of the contract, it would have directed the jury to evaluate whether

there was cause for termination by using this two-step analysis: "(1) Did DE determine that Becker engaged in willful misconduct in the course of its duties?"; and "(2) Was that decision made in good faith based on the information then known to DE?." Appellant's Brief, p. 25. However, the first inquiry is unnecessary, because it was never in dispute – at least that is the reason that DE has consistently recited for Becker's termination and was the only reason discussed throughout the case. In essence, then, according to DE, the only issue as to cause for termination was whether DE acted in good faith. In this regard, the trial court instructed the jury that:

> The issue of fact for you, the jury, to decide is whether or not Mr. Becker's conduct with respect to Mr. Eads constituted an act of willful misconduct and whether Mr. Becker's employment was properly terminated for cause. As indicated above, the agreement provides that the termination must be made in, quote, "good faith." Thus, a second issue is whether Direct Energy's termination of Mr. Becker on the basis that his conduct was an act of willful misconduct, breached [its] obligation to exercise good faith and fair dealing in interpreting the agreement to justify terminating Mr. Becker's employment.

Tr. at pp. 825-826.

{¶ 105} In view of this instruction, DE's argument is based on the proverbial "distinction without a difference." Accordingly, we find no abuse of discretion or error in the trial court's instructions. The Third Assignment of Error, therefore, is overruled.

## V. Did the Trial Court Err in Awarding Attorney Fees?

{¶ 106} DE's Fourth Assignment of Error states that:

The Trial Court Erred in Finding that Appellant Acted in Bad Faith and Awarding Attorney Fees.

{¶ 107} Under this assignment of error, DE makes four main points: (1) attorney fees for bad faith conduct are allowed only in limited situations, and DE's conduct did not fit within the exception; (2) the trial court created a new exception by concluding that a jury's finding of an absence of good faith equates to bad faith sufficient to impose attorney fees; (3) even if such a breach could automatically lead to an award of fees under the bad faith exception, the jury verdict resulted from the trial court's "escalating errors" and cannot stand; and (4) the court abused its discretion by penalizing DE for mounting a colorable defense.

{¶ 108} Ohio follows the "American rule," which provides that prevailing parties in civil actions may not recover attorney fees as part of litigation costs. *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, 906 N.E.2d 396, ¶ 7. This rule has limited exceptions, including the one asserted here, i.e., that a prevailing party may be awarded attorney fees after demonstrating the unsuccessful litigant's bad faith. *Id.*, citing *Pegan v. Crawmer*, 79 Ohio St.3d 155, 156, 679 N.E.2d 1129 (1997).

{¶ 109} Bad faith can involve conduct during litigation, but can also involve conduct giving rise to a party's claim. *See, e.g.*, *Brooks v. Dayton*, 70 Ohio App.3d 722, 723, 591 N.E.2d 1352 (2d Dist.1990) (fees awarded based on city's failure to return money that police had seized); *Thomason v. Hamilton*, 2d Dist. Greene No. 07-CA-60, 2008-Ohio-3492, ¶ 10 (trial court erred in awarding attorney fees to plaintiff when it granted motion for default judgment; plaintiff's complaint did not allege bad faith on defendant's part);

*SST Bearing Corp. v. Twin City Fan Cos., Ltd.*, 1st Dist. Hamilton No. C-110611, 2012-Ohio-2490, ¶ 28-30 (attorney fees awarded based on trial court's finding that defendant acted in bad faith in cancelling a contract); *Clem v. Steiner*, 11th Dist. Portage No. 2002-P-0056, 2003-Ohio-4865, ¶ 28 (evidence at trial showed that contractor willfully and wrongfully withheld payment from subcontractor, and trial court properly awarded attorney fees under the "bad faith" exception).

{¶ 110} Trial court decisions on attorney fees are within the court's sound discretion and are reviewed for abuse of discretion. *SST Bearing Corp.* at ¶ 29; *Clem* at ¶ 28;

{¶ 111} As was noted above, the parties agreed on the interrogatories to be answered by the jury. In an interrogatory relating to breach of good faith and fair dealing, the jury was asked the following question:

> Do you find that Plaintiff proved by the preponderance of the evidence that Defendant's decision to terminate him "for cause" was made in bad faith to take advantage of Plaintiff and improperly deny him the benefits he would have received if he had been terminated "without cause" under the contract?

Doc. #68, p. 3.

{¶ 112} The jurors unanimously answered "yes" to this question. *Id.* After Becker filed an application for attorney fees, and the parties had briefed the matter, the trial court filed a decision awarding attorney fees to Becker. In doing so, the court relied on a number of points. First, the court noted the jury's finding of bad faith. In addition, the court noted its instruction to the jury that it could not find for Becker regarding a breach

of good faith and fair dealing unless it found that DE's action in terminating Becker from his position for cause " 'was not an act of honesty in interpreting and applying the language in the Employment Agreement, but was instead an act of dishonesty in applying the definition of cause for an ulterior purpose or motive, and not a truthful interpretation or application of the definition of "cause" as contemplated by the parties.' " Doc. #88, Decision and Entry Regarding Motion for Award of Attorney Fees, p. 2, quoting Jury Instructions, p. 10.

{¶ 113} Next, the court discussed various authorities allowing attorney fees under the bad faith exception to the American rule. The court also remarked that, based on the jury's findings, DE's imposition of its interpretation of "cause" was done for "ulterior purposes and not as a result" of Becker's conduct. *Id.* at p. 6. The court further stressed that the jury had found DE's "interpretation and continued emphasis of it as a defense, to be dishonest." *Id.* at pp. 6-7. After deducting $570 that Becker conceded should be eliminated, the court awarded Becker the remaining amount he had requested in attorney fees. *Id.* at p. 9.

{¶ 114} As was noted, DE's first argument is that its conduct did not fit within the limited exception for bad faith. According to DE, Ohio courts have typically only enforced this exception where a party enters into a contract intending to violate it or where a breaching party's conduct is characterized by vengefulness or desire to harm the other side. This is inaccurate. While these can be grounds, the cases we cited did not require vengefulness or a desire to harm, nor did they involve circumstances where a party entered into a contract intending to violate it.

{¶ 115} However, even if such facts were required, the jury specifically found that

DE acted in bad faith to take advantage of Becker and deny him benefits. This certainly indicates a desire to harm.

{¶ 116} DE's second argument is that the trial court's decision created a new "per se" rule that a violation of the duty of good faith and fair dealing automatically results in an award of attorney fees. Again, we disagree. The jury did not just find that DE had breached the duty of good faith and fair dealing; it specifically found that DE had acted to take advantage of Becker. In addition, the trial court relied on the jury instructions, which made a bad faith decision contingent on finding that DE acted dishonestly. Doc. #88 at p. 2. Jury instructions will not be the same in every case, and we do not view the trial court's decision as a "per se" rule. All cases will be decided on their own facts.

{¶ 117} In connection with this argument, DE also argues that the trial court misunderstood applicable law. According to DE, there is a distinction between a lack of good faith and bad faith, because " '[a] violation of the covenant of good faith and fair dealing does not require a showing of bad faith, but rather a lack of good faith.' " Appellant's Brief, p. 31, quoting *Lewis v. Am. Warming & Ventilating*, Lucas C.P. No. CI 201401193, 2015 Ohio Misc. LEXIS 22009 [*12, fn.9 (Jan. 15, 2015)]. Based on the quoted statement, DE proposes that the lack of good faith is an "intermediate step" between good faith and the presence of bad faith and is not sufficient for an award of attorney fees.

{¶ 118} As a preliminary point, we note that *Lewis* is the only case cited by DE for this proposition. However, *Lewis* applied Massachusetts law. *Lewis* also did not involve a bad faith claim for attorney fees.

{¶ 119} In *Slater v. Motorists Mut. Ins. Co.*, 174 Ohio St. 148, 187 N.E.2d 45, 46

(1962), the Supreme Court of Ohio stated that:

> A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.

*Id.* at paragraph two of the syllabus.

{¶ 120} *Slater* and another case, *Motorists Mut. Ins. Co. v. Said*, 63 Ohio St.3d 690, 590 N.E.2d 1228 (1992), were overruled on other grounds *in Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397 (1994). In *Zoppo*, the court noted that until its decision in *Said*, "the element of intent had been notably absent from this court's definition of when an insurer acts in bad faith." *Zoppo* at 554. Instead, the court had "applied the 'reasonable justification' standard to bad faith cases." *Id.* Under this standard, " 'an insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor.' " *Id.*, quoting *Staff Builders, Inc. v. Armstrong*, 37 Ohio St.3d 298, 303, 525 N.E.2d 783 (1988). The court stressed that intent had never been part of this standard. *Id.* at 555.

{¶ 121} After the decision in *Zoppo*, Ohio courts have continued to use the definition in *Slater* to define bad faith, although, of course, a requirement of intent for bad faith in processing claims would not apply to insurers. In this context, *see, e.g., Palmer v. Daniel Troth & Son Builders, Inc.*, 10th Dist. Franklin No. 97APE08-1050, 1998 WL

255566, *6 (May 19, 1998) [(affirming attorney fees trial court awarded for plaintiff's bad faith in bringing groundless claim under Consumer Sales Practices Act ("CSPA")); *State ex rel. Bardwell v. Cuyahoga Cty. Bd. of Commrs.*, 8th Dist. Cuyahoga No. 93058, 2009-Ohio-5573, ¶ 14 (violation of Civ.R. 11 by filing for writ of mandamus in bad faith); *DiPasquale v. Costas*, 186 Ohio App.3d 121, 2010-Ohio-832, 926 N.E.2d 682, ¶ 127 (2d Dist.) (definition applied to breach of fiduciary duty of good faith); *LEH Properties, Inc. v. Pheasant Run Assn.*, 9th Dist. Lorain No. 10CA009780, 2011-Ohio-516, ¶ 1 (affirming award of attorney fees in case involving breach of a settlement agreement and award of attorney fees based on bad faith exception); *Semco, Inc. v. Sims Bros.*, 3d Dist. Marion No. 9-12-62, 2013-Ohio-4109, ¶ 49 (affirming award of attorney fees based on bad faith in including CSPA claim in complaint).

**{¶ 122}** However, even if a distinction existed between "lack of good faith" and "bad faith," the jury specifically found that DE acted in "bad faith with intent to take advantage of" Becker and "to deny him the benefits he would have received if he had been terminated without cause." This is not merely a "lack of good faith"; it is a specific finding of bad faith, i.e., conscious wrongdoing.

**{¶ 123}** As was noted, DE's third argument is that the award of attorney fees should be set aside due to the trial court's "escalating errors." Since we have concluded that no error existed, we need not address this point further.

**{¶ 124}** DE's final argument is that the trial court abused its discretion by penalizing DE for mounting a colorable defense. In this regard, DE points out that it obtained dismissal of two counts (unjust enrichment and intentional misrepresentation) on summary judgment, and prevailed at trial on the defamation claim. According to DE,

defendants are generally not liable for attorney fees when they are at least partially successful. In addition, DE contends that the trial court punished it for making tactical decisions, which is prohibited.

{¶ 125} We have reviewed the decision, and the trial court's choice to award attorney fees was based on the jury's findings, not on the court's alleged desire to punish DE for trying the case. Throughout the decision, the court repeatedly focused on the jury's findings.

{¶ 126} As support for its contention that the trial judge punished it, DE quotes the following statement:

The court finds that Defendant's conduct toward Becker caused him to incur attorney fees to pursue this action even to a jury trial in which it told the jury that Becker had violated the company's behavior standards and had physically attacked the subordinate employee and bullied him contrary to important company policies. *The jury found this interpretation and the continued emphasis of it as a defense, to be dishonest.*

(Emphasis added.) Appellant's Brief at p. 34, fn. 8, quoting Doc. #88 at pp. 6-7. However, even in making this statement, the trial court relied on the jury's findings.

{¶ 127} As to DE's other contention, a case cited by DE did hold that "where a defense to a complaint is at least partially successful, a defendant is generally not responsible for attorney fees under the bad faith exception to the American Rule." *State ex rel. Davis v. Hocking Cty. Commrs.*, 4th Dist. Hocking No. 94CA19, 1995 WL 767921, *8 (Dec. 22, 1995), citing *State ex rel. Caspar v. City of Dayton*, 53 Ohio St.3d 16, 20, 558 N.E.2d 49 (1990), and *State ex rel. Kabatek v. Stackhouse*, 6 Ohio St.3d 55, 451

N.E.2d 248 (1983).

**{¶ 128}** In considering this issue, the trial court noted the parties' arguments, with DE contending that attorney fees should be reduced because Becker was not the prevailing party on several claims, while Becker contended that all the claims were based on the same core facts and that different theories of recovery were not a basis to reduce the reasonableness of the overall fee. The court concluded that Becker was the prevailing party because, while three theories went to the jury, they "all were part of the same set of facts." Doc. #88 at p. 8. In addition, the court provided the following reasoning for awarding the total amount of requested fees:

> Although Direct Energy's defenses to each theory cannot be considered as bad faith, the jury only considered the breach of good faith and fair dealing with respect to the contract claim. The jury viewed Direct Energy's defense as dishonest and, necessarily, Becker's view as valid and honest. But for Direct Energy's bad faith in breaching the contract and maintaining its dishonest position throughout the trial, Becker would not have been forced to incur attorney's fees to vindicate his honest view of the contract. Thus, all fees incurred were necessarily the result of defendant's bad faith. The jury did reject the defamation claim on its merits, but very likely considered the statement that Becker was merely "passing the torch" as a veiled cover-up for its "dishonest" decision to terminate Becker for cause, denying him the benefit of the bargain, and forcing the litigation that ended in the jury trial.

*Id.* at p. 8.

{¶ 129} As was noted, we review the trial court's decision on attorney fees for abuse of discretion. *SST Bearing*, 1st Dist. Hamilton No. C-110611, 2012-Ohio-2490, at ¶ 29. This is a deferential review and does not allow us to substitute our judgment for that of the trial court. *Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, at ¶ 14. Most often, an abuse of discretion means that a ruling lacked a sound reasoning process, but it also includes decisions that are arbitrary or capricious. *AAAA Ents.,* 50 Ohio St.3d at 161, 553 N.E.2d 597.

{¶ 130} After reviewing the decision, we cannot find an abuse of discretion. Notably, the rule that DE relies on is a general rule. In addition, the cases we mentioned above do not assist because the courts found no bad faith, and, therefore, did not consider whether, or to what extent, fees should be reduced. See *Davis,* 4th Dist. Hocking No. 94CA19, 1995 WL 767921, at *8 (no evidence of bad faith); *Caspar,* 53 Ohio St.3d at 20, 558 N.E.2d 49 (because defense was partially successful, defendant did not act in bad faith); *Kabatek*, 6 Ohio St.3d at 56, 451 N.E.2d 248 (the fact alone of interposing an unsuccessful defense does not demonstrate bad faith). In contrast to these cases, DE was specifically found to have acted in bad faith.

{¶ 131} In the context of claims under 42 U.S.C. 1988, parties are considered "prevailing for attorney fees purposes if they succeed on any significant issue in litigation that achieves some of the benefit the parties sought in bringing suit." *Knutty v. Wallace*, 100 Ohio App.3d 555, 559, 654 N.E.2d 420 (10th Dist.1995). Similarly, in a case involving the CSPA, the Supreme Court of Ohio agreed that the " 'substantial-victory' test" accorded "with the intent and purpose of the statutory allowance of attorney fees." *Parker v. I & F Insulation Co.*, 89 Ohio St.3d 261, 264, 730 N.E.2d 972 (2000). Under

this test, "a party 'must achieve only substantial, not complete, victory.' " *Id.*, quoting from *Parker* at *6.

{¶ 132} The standard used in *Parker* has also been applied in a case where the trial court awarded fees under both R.C. 2323.51 and the common law, i.e., where, as here, the losing party was deemed to have acted in bad faith. *Thomas v. Cincinnati*, 1st Dist. Hamilton No. C-050643, 2006-Ohio-3598, 2006 WL 1934402, *3. In affirming the award, the court of appeals commented that:

> A prevailing party is one who has been awarded at least some relief on the merits of his or her claims. * * * A party who appeals an order or judgment and prevails to the extent that he obtains a new trial, or a modification of the judgment, is a prevailing party. The party need only obtain a substantial, not a complete, victory. *Parker v. I & F Insulation Co.*, 89 Ohio St.3d 261, 264-265, 2000-Ohio-151, 730 N.E.2d 972. The issue is whether, at the end of the suit or other proceeding, the party who has made a claim against the other has successfully maintained it.

(Citations omitted.) *Thomas* at *4.

{¶ 133} Furthermore, even if this standard were not applied here, courts have held that "it is not always possible to divide attorney fees for distinct claims. If claims 'involve a common core of facts or will be based on related legal theories,' it may be 'difficult to divide the hours expended on a claim-by-claim basis.' " *Edlong Corp. v. Nadathur*, 1st Dist. Hamilton No. C-120369, 2013-Ohio-1283, ¶ 16, quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Thus, "where multiple claims are rooted in the same allegations, facts, discovery, and legal arguments, a trial court does

not abuse its discretion in awarding attorney fees for the time spent on the claims." *Id. See also Arnett*, 2d Dist. Montgomery No. 25371, 2013-Ohio-1065, at ¶ 50; *Miller v. Grimsley*, 197 Ohio App.3d 167, 2011-Ohio-6049, 966 N.E.2d 932, ¶ 17 (10th Dist.); *Gilson v. Am. Inst. of Alternative Medicine*, 10th Dist. No. 15AP-548, 2016-Ohio-1324, 62 N.E.3d 754, ¶ 119.

**{¶ 134}** *Arnett* involved a situation in which a land contract provided for payment of reasonable attorney fees in the event of a default. *Id.* at ¶ 34. The seller brought suit and prevailed on a breach of contract claim, but did not prevail on his claims for reimbursement of past property taxes and condominium fees. *Id.* at ¶ 48. On appeal, the defendant claimed the seller should not have been awarded the full amount of his attorney fees because he failed to prevail on some issues. *Id.* We concluded that the trial court did not abuse its discretion in awarding the full amount of the fees, because the claims in the seller's "amended complaint involved a common core of facts, making it difficult to separate 'a claim for which fees are recoverable and a claim for which no fees are recoverable.' " *Id.* at ¶ 52, quoting *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 145, 569 N.E.2d 464 (1991).

**{¶ 135}** In *Hensley*, the court explained the reasoning for failing to separate fees. The court observed that many cases (there, a civil rights case), "will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims." *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933, 76 L.Ed.2d 40.

**{¶ 136}** In the case before us, the trial judge, who presided over the entire proceeding, including the jury trial, agreed with Becker that all the claims were based on the same core set of facts, and that fees should not be reduced. Doc. #88 at pp. 7-8. Based on our review of the entire record, we cannot conclude that this decision was an abuse of discretion.

**{¶ 137}** Becker's claim for defamation was based on a statement that DE made to employees about his departure. DE employee, Holly Waterson, put together the alleged defamatory statement, which said that Becker was "passing the torch" to another employee. Waterson stated that she knew Becker was being terminated for cause, and that, in her opinion, the use of this phrase was intended to suggest that Becker was leaving voluntarily. Tr. at pp. 501-502.[4] She also described it as an "internal calms piece" and said there might have been concern in the organization if the communication stated that Becker had been terminated or if there were no communication about his departure. *Id.* McGarry also testified that Becker did not leave because he was "passing the torch" to another employee; instead he was terminated. Tr. at pp. 275.

**{¶ 138}** One interpretation of these facts is that DE was using this untrue statement to cover up its dishonest decision, as the trial court suggested. Doc. #88 at p. 8. As a result, the facts were intertwined, and the claims were all part of the same facts. The trial court's choice not to reduce the fees, therefore, was not unsound, arbitrary, or capricious.

**{¶ 139}** Accordingly, the Fourth Assignment of Error is overruled.

---

[4] Waterson did not testify at trial, but her deposition was read to the jury. *See* Tr. at p. 499.

## VI.   Conclusion

**{¶ 140}** All of Appellant's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.

Copies sent to:

Jeffrey M. Silverstein
Randolph H. Freking
Angelique Paul Newcomb
Chad J. Kaldor
Hon. Richard Skelton